Peter E. Martin, SBN 121672
Shelley K. Mack, SBN 209596
**Peter E. Martin, A Law Corporation**
917 Third Street
Eureka, California 95501
Tel: (707) 268-0445
Fax: (707) 667-0318
peter@petermartinlaw.com
shelley@petermartinlaw.com

Attorneys for Plaintiffs
STACY COBINE, NANETTE DEAN,
CHRISTINA RUBLE, LLOYD PARKER,
GERRIANNE SCHULZE, SARAH HOOD,
AARON KANGAS, LYNETTE VERA,
AUBREY SHORT, MARIE ANNTONETTE KINDER,
and JOHN TRAVIS

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STACY COBINE, NANETTE DEAN, CHRISTINA RUBLE, LLOYD PARKER, GERRIANNE SCHULZE, SARAH HOOD, AARON KANGAS, LYNETTE VERA, AUBREY SHORT, MARIE ANNTONETTE KINDER, and JOHN TRAVIS,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF EUREKA, EUREKA POLICE DEPARTMENT, and ANDREW MILLS, in his official capacity as Chief of Police,<br><br>Defendants. | CASE NO.<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>(Fourth, Eighth and Fourteenth Amendments to the United States Constitution; United States Bill of Rights; Article I, Sections 1 and 7 of the California Constitution; 42 U.S.C. § 1983; 42 U.S.C. § 4622)<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Stacy Cobine, Nanette Dean, Christina Ruble, Lloyd Parker, Gerrianne Schulze, Sarah Hood, Aaron Kangas, Lynette Vera, Aubrey Short, Marie Anntonette Kinder, and John Travis (collectively, "Plaintiffs"), for their Complaint against Defendants the City of Eureka, Eureka Police Department, and Andrew Mills, in his official capacity as Chief of the Eureka Police Department (collectively, "Defendants"), hereby allege as follows:

**NATURE OF THE ACTION**

1.     The City of Eureka ("the City") has announced that on May 2, 2016, it will evict approximately 150 homeless people who are currently living at a homeless encampment at the Palco Marsh.  The Palco Marsh is located on City property near the Bayshore Mall in Eureka, California.  The homeless encampment located at the Palco Marsh has existed there for at least fourteen years, since 2002.

2.     The people whom the City plans to evict on May 2 have lived at the Palco Marsh for many years with the tacit and often explicit permission of the City and the Eureka Police Department ("EPD").  A substantial number of the Palco Marsh encampment's residents were instructed to camp in the Palco Marsh by officers from the EPD, and for years, EPD officers have visited the Palco Marsh several times per week and talked with the homeless people there without citing, arresting, or telling them to leave.  For a number of years, the EPD and the City of Eureka have declined to enforce the City of Eureka's municipal anti-camping ordinance at the Palco Marsh encampment.  Based on the understanding that the City and the EPD would allow them to remain at the Palco Marsh, residents erected tents and other structures to shelter themselves from the elements and create an area of privacy for themselves.  In reasonable reliance on the permission of the City, Plaintiffs and other homeless persons have brought personal property to the Palco Marsh, which they use in their daily lives.  These activities have been well-known to the City and EPD for more than a decade.

3.     On March 18, 2016, the Eureka City Council established a deadline of May 2, 2016 to remove all encampments in violation of the City's anti-camping ordinance, codified at Eureka Municipal Code Section 93.02, from the Palco Marsh and all other locations in Eureka. On March 22, 2016, the EPD distributed flyers entitled "Notice to Vacate" to residents of the

Palco Marsh.   As a result of the City's decision to set this May 2nd deadline, Plaintiffs and all other residents of the Palco Marsh encampment will be evicted – not only from the Palco Marsh, but from the City of Eureka altogether, as the City's anti-camping ordinance (1) applies to "any public or private space or public or private street" within the Eureka city limits, except for "areas specifically designated for such use," and does not designate any areas in which camping is permitted; and (2) defines "camp[ing]" to include "residing in or using a public or private space for living accommodation purposes" or "living in a parked vehicle."   Strict enforcement of this municipal anti-camping ordinance will have the intended effect of excluding homeless residents from the City of Eureka altogether.  The City's anti-camping ordinance has not been enforced at the Palco Marsh for many years.   The City's decision to begin enforcing the municipal anti-camping ordinance marks a highly prejudicial and untimely shift from the City's prior policy of at least allowing – and in some instances, encouraging – the presence of the Palco Marsh encampment.

4.    The City's enforcement of its anti-camping ordinance beginning on May 2, 2016 will remove Plaintiffs and all other residents of the Palco Marsh encampment from their homes, deprive them of shelter, and ultimately drive them out of the City of Eureka entirely.  Given the extremely broad sweep of the City's municipal anti-camping ordinance, and the City's failure to attempt to transition any of those residents into housing or to designate an alternate location where they may camp for more than 40 days after the eviction, many Palco Marsh residents will have no choice but to leave the City of Eureka altogether and relocate to neighboring jurisdictions to avoid citation and/or arrest.   Neighboring municipalities in Humboldt County have their own sizeable homeless populations, and not enough housing or shelter for those existing homeless residents, let alone for the scores of people whom the City of Eureka intends to evict from the Palco Marsh.

5.    The effects of driving Plaintiffs and the other residents of the Palco Marsh encampment from their homes and shelters without providing any viable housing or camping alternative will be devastating.  Many of the residents of the Palco Marsh encampment, including many of the Plaintiffs, have physical and/or mental disabilities, some of which are severe.  Many

will suffer traumatic emotional distress if evicted, and many more will be forced by the City's actions into situations that threaten their health, safety and general well-being. Many Palco Marsh residents have experienced crime and harassment living on the street. For these people, the Palco Marsh encampment provides them with a sense of safety and a supportive community.

6.    The City's intended timeline for evicting homeless persons from the Palco Marsh by May 2 does not afford them a realistic prospect of finding appropriate alternative housing. Some have no income at all, and others lack sufficient income to secure housing in Eureka or surrounding areas without a subsidy or other financial support. Some lack any form of legal identification. Many have no rental or credit history.

7.    The City has not provided any realistic alternative location for all of the Plaintiffs and the other residents of the Palco Marsh encampment to go when the encampment is evicted on May 2. For a period of sixty (60) days, from April 11 to June 10, 2016, the City will allow 50-60 displaced Palco Marsh residents and other homeless in Eureka to sleep between the hours of 8:00 p.m. and 7:00 a.m. in a city-owned parking lot, but those who do must pack up all their belongings by 7:00 a.m. and leave the parking lot for the day. No storage of personal belongings or sheltering items is permitted at the parking lot. Two emergency shelter locations are also available in the City of Eureka, but those facilities have insufficient capacity to house all the Palco Marsh residents facing expulsion on May 2. If the homeless displaced from the Palco Marsh attempt to sleep in any other public or private space within Eureka city limits, they will be in violation of the City's anti-camping ordinance. If they try to sleep on the sidewalk, they will be threatened with citation or arrest under the City's municipal ordinance prohibiting the obstruction of movement in public thoroughfares, codified at Eureka Municipal Code Section 130.13. By evicting them from the Palco Marsh, taking away their only shelter and forcing them onto the streets -- without providing or committing to provide adequate resources to transition them into housing, or designating an alternate location where people who cannot afford the price of rent in Eureka can camp -- the City of Eureka will be exposing Plaintiffs and the other residents of the Palco March encampment to serious dangers they otherwise would not face.

8.    The City has not provided or committed to provide adequate resources to permit

even a small number of Palco Marsh residents to find long-term alternative housing, much less the more than 140 people currently living at the Palco Marsh encampment.  The City of Eureka has so far refused to allocate any City funds at all towards relocation of the Palco Marsh residents set to be evicted.

9.    This is an action brought by and on behalf of residents of the Palco Marsh encampment, who face summary eviction from the homes in which they have lived for years with the acquiescence, if not express instruction and/or permission, of the City of Eureka, and where they have enjoyed a reasonable expectation of privacy.  If the City proceeds with its planned May 2 eviction of the Palco Marsh community, all that the Plaintiffs now have will be taken away from them.  Their property will be seized, many of their animals will be confiscated, and their homes will be destroyed.  On May 2, Plaintiffs and the other Palco Marsh residents will have just three options.  If they are willing to give up their privacy, if their disabilities do not prevent them, and if space allows, they can sleep on the ground in a City-owned parking lot, but only between the hours of 8:00 p.m. and 7:00 a.m. and only until June 10.  They can sleep in one of a limited number of emergency shelter beds in Eureka if one is available and they meet the shelter's entrance requirements.  There are not, however, enough available shelter beds within the City of Eureka to house all of the existing residents of the Palco Marsh encampment.  Those who choose to sleep in the City-owned parking lot or in an emergency shelter and who wish to remain in Eureka during the daylight hours must roam the streets with their animals and all their belongings, constantly remaining on the move so as not to violate the City's municipal ordinances against camping and obstruction of public thoroughfares and thereby risk citation and/or arrest.  Plaintiffs and the other residents of Palco Marsh also have the option of risking almost certain arrest by sleeping or resting in violation of City ordinances, and the option of leaving Eureka altogether.  Plaintiffs have no realistic option of finding affordable long-term housing as a means of avoiding the foregoing alternatives because of the imminence of the City's planned eviction of the Palco Marsh encampment.  The City of Eureka's plan to enforce its municipal "anti-camping" ordinance against Plaintiffs and the other homeless individuals who shelter at the Palco Marsh encampment violates their rights guaranteed under the United States

Constitution, the California State Constitution, and federal and state law.

10.    Plaintiffs bring this action for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983.  Defendants intend, under color of state law and on an ongoing basis, to violate Plaintiffs' rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 1 and 7 of the California Constitution, as well as the Uniform Relocation Assistance Act and accompanying state law.  Plaintiffs seek this relief to enjoin Defendants from proceeding with their plan to evict the residents of the Palco Marsh encampment *en masse* on May 2, 2016 through enforcement of Eureka Municipal Code Section 93.02.

## PARTIES

11.    Plaintiff Stacy Cobine is a United States citizen residing in Eureka, California. She is homeless within the federal definition provided by 42 U.S.C. § 11302.  Ms. Cobine is a 43-year-old resident of Humboldt County, and has resided continuously in Humboldt County for nearly twenty years.  Ms. Cobine has resided at the Palco Marsh encampment for approximately six (6) months, and on a previous occasion resided there for an additional four (4) to five (5) months.

12.    Ms. Cobine has been diagnosed with bipolar disorder, post-traumatic stress disorder ("PTSD"), borderline personality disorder, and obsessive-compulsive disorder ("OCD"), and has been receiving SSI disability benefits since 2008.  She is a trained nurse's aide, and has worked as a nursing aide at Humboldt Radiology and other locations in Humboldt and Monterey counties.  In 2001, Ms. Cobine injured her shoulder, and because her injury prevented her from performing all the duties her job required, she was fired.  It has been difficult for her to find work since.

13.    Ms. Cobine lives at the Marsh in a tent covered with tarps, along with her five-year-old dog Lazarus.  She volunteers for the Humboldt Area Center for Harm Reduction ("HACHR"), passing out clean needles, condoms, and overdose reversal kits at the Palco Marsh, and acts as the unofficial camp medic for the Marsh encampment.

14.    When Ms. Cobine moved to the Palco Marsh, EPD officers told her that as long

as there was no obvious violence and residents kept to themselves, they could stay at the Palco Marsh and police would leave them alone.  She was never instructed to leave the Palco Marsh until last month, when the EPD distributed Notices to Vacate by May 2, 2016.  In mid-April, Eureka Police Officer Neil Hubbard told Ms. Cobine that the City was clearing out the jail to make room for the residents of the Palco Marsh who will be evicted on May 2.

15.    Ms. Cobine desires stable housing, and her therapist and a local outreach program have tried to find housing for her, but her multiple mental illnesses have made it difficult for her to obtain and stay in a stable housing situation.

16.    Plaintiff Nanette Dean is a United States citizen residing in Eureka, California.  She is homeless within the federal definition provided by 42 U.S.C. § 11302.  Ms. Dean has resided at the Palco Marsh encampment since November 4, 2014.  Ms. Dean is 41 years old, was born and raised in Humboldt County, and has resided in Humboldt County on and off throughout her childhood, teenage and adult years.  She continues to reside in Humboldt County in order to remain close to her 13-year-old daughter, who resides in Rio Dell.

17.    Before becoming homeless, Ms. Dean was living in a camp trailer rented from her brother and working as a store clerk at CC's Market in Rio Dell.  She was saving up money from her job to obtain housing for her and her daughter, but when her brother threw her out of the trailer she was renting from him, she was forced to spend the housing money she had saved on a temporary motel.  When she ran out of money, Ms. Dean moved to the Palco Marsh.

18.    Ms. Dean has endured multiple serious traumas over the course of her life.  When she was a senior in high school in Olivehurst, California, Ms. Dean survived a shooting spree at Lindhurst High School in which three students and one teacher were killed and another nine students and a teacher were injured.  A bullet flew past her as she ducked under her desk and hit a boy behind her, who subsequently died.  On July 25, 1992, shortly after the shooting, Ms. Dean's father had a heart attack and died.  In October, 1992, her grandfather had a major heart attack and eventually passed away in 1998.  Ms. Dean's best friend also died of cancer in 1992.

19.    On May 1, 1998, just after her grandfather died, Ms. Dean was held at gunpoint while working at a McDonald's in Yuba City, California.  The gunman lined up Ms. Dean and

the other employees and told them that if they did as he said, no one would get hurt. He put Ms. Dean and her co-workers in a walk-in cooler and told them not to come out. She and her colleagues were in the cooler so long the cartilage in their ears froze. The gunman robbed the safe and has never been caught.

20.    As a result of the traumas and losses she has experienced since she was a teenager, Ms. Dean has been diagnosed with PTSD. Her therapist, who specializes in treating combat veterans, once told Ms. Dean that she has the most severe case of PTSD her therapist had seen in 30 years of practice. Ms. Dean also suffers from diabetes, and as a result she has neuropathy in her right foot. Her foot has broken twice due to the neuropathy, leading to a condition called Charcot foot, which makes her bones very weak and fragile and has deformed her foot over time. In late 2015 and early 2016, while living at the Palco Marsh, Ms. Dean developed gangrene in her left foot and had to have her big toe partially amputated. She was released from the hospital with an open wound. After coming back to the Marsh, the wound became infected, and she had to undergo two more surgeries in which the rest of her big toe, her second toe, and part of her third toe were amputated. She now suffers from phantom pain in her left foot, and has to wear special orthopedic shoes on both feet.

21.    Ms. Dean has sought and continues to seek housing other than at the Palco Marsh, but those efforts have been unsuccessful to date. In the time she has been living at the Marsh, she has applied for housing at various locations without success. Her extremely low income, mental and physical disabilities, bad credit, and her dog all contribute to make it difficult for her to find housing. She does not want to go to an emergency shelter that will not permit her to bring her one-year-old dog, Trixie, and she does not want to be subjected to religious instruction in order to take advantage of emergency shelter services.

22.    Plaintiff Christina Ruble is a United States citizen residing in Eureka, California. She is homeless within the federal definition provided by 42 U.S.C. § 11302. Ms. Ruble is 47 years old, has resided in Humboldt County for 27 years, and has lived at the Palco Marsh encampment for six (6) years in a tent draped with tarps. Ms. Ruble became homeless when she separated from her partner and had no income and no place to go. Ms. Ruble has sought and

continues to seek housing other than at the Palco Marsh, but those efforts have been unsuccessful to date. She has not been able to obtain alternate housing due to her lack of income and poor rental history.

23.    Before coming to the Palco Marsh, Ms. Ruble was living near the Del Norte Pier in Eureka. Eventually, EPD officers gave her a ticket for camping near the Pier and told her to move her camp to the Palco Marsh instead.

24.    Since becoming homeless, EPD officers have torn down Ms. Ruble's camp site on at least one occasion. At least once during weekly cleanup at the Palco Marsh, the police left all the garbage at her campsite and disposed of all her personal belongings instead.

25.    Several months ago, EPD officers gave Ms. Ruble a Mobile Intervention Support Team ("MIST") Homeless Tracking and Accountability brochure, which stated that she was camping on City property without permission and could be cited or arrested. The police told her that she had to sign the MIST brochure, and that if she refused, they would confiscate her belongings and tear down her camp.

26.    On a different occasion a few months ago, EPD officers came to Ms. Ruble's tent and showed her a laminated flyer with pictures showing examples of campsites built with materials that were prohibited at the Palco Marsh encampment, including bricks and cement blocks. When they showed her this flyer, EPD officers told her that if she followed the rules it laid out, she could remain at the Palco Marsh.

27.    Plaintiff Lloyd Parker is a United States citizen residing in Eureka, California. He is homeless within the federal definition provided by 42 U.S.C. § 11302. Mr. Parker is 57 years old, has lived in Eureka on and off his entire life, and has resided at the Palco Marsh encampment for more than a year.

28.    Mr. Parker became homeless when his wife died of cancer and his children left home. He was a professional carpenter for 25 years, working on everything from new construction to remodels of commercial and residential buildings, hotels and high rises. Mr. Parker last worked for Hilltop Builders in Eureka and was laid off about two-and-a-half years ago. He would like to find work in the construction business again and looks for available

construction jobs every week, but his efforts to find new employment have so far been unsuccessful. It is difficult for Mr. Parker to find work now because he has no legal identification and no car, and he is worried about the toll a new job will take on his health. Mr. Parker has high blood pressure that is not being treated at present.

29. Mr. Parker previously lived 500 to 600 yards away from his current campsite, but a few months ago, the EPD began moving both ends of the camp together and moved all of his belongings into the compressed campsite area. When they moved his campsite, an EPD officer told him it was okay for him to stay there as long as he remained within the newly compressed area.

30. Mr. Parker has sought and continues to seek housing other than at the Palco Marsh, but those efforts have been unsuccessful to date. Although he used to own a home, he now has an eviction locally and no income, which makes it very difficult for him to obtain housing again.

31. Plaintiff Gerrianne Schulze is a United States citizen residing in Eureka, California. She is homeless within the federal definition provided by 42 U.S.C. § 11302. Ms. Schulze is 51 years old and has lived in Humboldt County her entire life. She has resided at the Palco Marsh for approximately two (2) years.

32. Ms. Schulze became homeless when she fell behind on rent after she was laid off from her job and her family lost her son's SSI benefits when he turned 18. Until she was laid off two or three years ago, Ms. Schulze worked at Sun Valley Floral Farms in Arcata for approximately a year-and-a-half. She has been unable to find another job since being laid off because of her mental and physical disabilities.

33. Ms. Schulze suffers from high blood pressure and very severe carpal tunnel syndrome. She has nerve damage in both arms extending up to her shoulders, and also suffers from PTSD. Since she began living at the Palco Marsh, Ms. Schulze has also started hearing voices.

34. About two years ago, when Ms. Schulze was living at the Del Norte Pier, EPD Officer Neil Hubbard told her to move her camp to the Palco Marsh. Officer Hubbard told her

that she would be safe at the Palco Marsh, and that the police wouldn't bother her there.

35.    Several months ago, EPD officers gave Ms. Schulze a MIST Homeless Tracking and Accountability brochure and asked her to fill out and sign it.  Four EPD officers surrounded her when they gave her the brochure, and she felt compelled to sign it.

36.    Ms. Schulze has sought and continues to seek housing other than at the Palco Marsh, but those efforts have been unsuccessful to date.  She would like to have stable housing with her two dogs, Max and Baby Girl, but has no money to pay for it, and her mental and physical disabilities make it very difficult for her to secure housing.  Housing is also difficult for Ms. Schulze to find because EPD officers threw her identification card away approximately two years ago when she was living at a different camp site in Eureka at the Blue Ox field.  While she was living at Blue Ox field, EPD officers also threw away all of her belongings while she was in the hospital and temporarily away from her camp, including all her photos of and irreplaceable items of sentimental value from her deceased mother and her deceased boyfriend.

37.    Plaintiff Sarah Hood is a United States citizen residing in Eureka, California.  She is homeless within the federal definition provided by 42 U.S.C. § 11302.  Ms. Hood is 23 years old, has lived in Humboldt County for two (2) years, and has been a resident of the Palco Marsh encampment since 2014.  She became homeless when she moved to Humboldt County and was unable to find a job.  Ms. Hood is pregnant and expecting the birth of a baby girl with her partner, Palco Marsh resident Aaron Kangas, on July 9, 2016.

38.    Ms. Hood lives at the Palco Marsh encampment in a nylon tent covered with tarps with her partner Aaron and their two dogs, Bagheera and Tierney.  She and Mr. Kangas have a bed, a stove, and a generator at their campsite.  Ms. Hood and Mr. Kangas previously lived approximately half a mile from their current campsite, but when EPD officers found them camping there, they instructed Ms. Hood and Mr. Kangas to move their camp to the Palco Marsh.

39.    On one occasion, EPD officers tore down Ms. Hood's tent when it was raining and threw it away.  All of her personal belongings were ruined, and she had to start from scratch to acquire everything she needed to put her camp back together.

40.     Several months ago, EPD Officer Neil Hubbard and Homeless Liaison Pamlyn Millsap forced Ms. Hood to sign the MIST Homeless Tracking and Accountability Brochure, which states that she is trespassing by camping at the Palco Marsh, that finding housing is her own responsibility, and that she can be cited or arrested for camping at the Palco Marsh. Officers Hubbard and Millsap told Ms. Hood she would be arrested if she refused to sign.  A few weeks ago, EPD officers gave Ms. Hood a Notice to Vacate, telling her that she must leave the Marsh by May 2, 2016 or face arrest.  EPD Officers Hubbard and Millsap took a photograph of Ms. Hood holding a copy of the Notice to Vacate flyer and threatened to arrest her if she refused to have the photo taken.

41.     Ms. Hood has sought and continues to seek housing other than at the Palco Marsh, but those efforts have been unsuccessful to date.  She has enrolled in the Welfare to Work program, and also has signed up for Section 8 subsidized housing, but there is a very long wait list.  Ms. Hood has no legal identification and no birth certificate at present, which makes it very difficult for her to secure housing or a job.

42.     Plaintiff Aaron Kangas is a United States citizen residing in Eureka, California. He is homeless within the federal definition provided by 42 U.S.C. § 11302.  Mr. Kangas is 53 years old, has resided in Humboldt County for 19 years, and has resided at the Palco Marsh encampment for approximately two-and-a-half years.  Mr. Kangas became homeless when he was released from jail in Humboldt County and had nowhere to go.  He has been camping at the same location in the Palco Marsh ever since.

43.     Mr. Kangas worked for four years as a carpenter building custom homes in Shelter Cove, but is currently unemployed.  Since becoming homeless, it has been difficult for him to find employment because he has no address to provide a potential employer.  Mr. Kangas receives food stamps, but otherwise has no income.

44.     A few weeks ago, EPD officers cited Mr. Kangas for camping at the Palco Marsh in violation of the City's anti-camping ordinance.

45.     Mr. Kangas has sought and continues to seek housing other than at the Palco Marsh, but those efforts have been unsuccessful to date.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

STACY COBINE *et al.* v. CITY OF EUREKA *et al.*

46.   Plaintiff Lynette Vera is a United States citizen residing in Eureka, California. She is homeless within the federal definition provided by 42 U.S.C. § 11302.  Ms. Vera is 50 years old, has been a Humboldt County resident since the age of 18, and has resided at the Palco Marsh encampment for approximately two-and-a-half years.

47.   Ms. Vera became homeless after divorcing from her physically and mentally abusive husband of 21 years.  As part of her divorce settlement, Ms. Vera's ex-husband was awarded the family home.  After her divorce, Ms. Vera received $275 per month in alimony payments from her ex-husband, but those payments stopped nine (9) years ago.  She was last employed in approximately 2008-2009, when she worked at Target in Eureka stocking shelves, but that job did not pay her enough to cover her rent and bills.  Ms. Vera has had no income since then, and has been denied general assistance and SSI benefits.

48.   Ms. Vera suffered from multiple traumas as a child.  When she was a young child, Ms. Vera's father tried to kill her mother with a car, and hurt her so badly she had to be put in a full body cast.  Later, when Ms. Vera was ten (10) years old, her father committed suicide.

49.   Ms. Vera was diagnosed with bipolar disorder 13 years ago.  She also suffers from depression and high risk of suicide.  Ms. Vera has a bad back and severe carpal tunnel syndrome, which makes it difficult for her to pick things up.  Due to a heriditary condition, Ms. Vera needs surgery to remove a portion of her intestines because they are knotted up.  She has so far refused that surgery because it would mean she would have to use a colostomy bag for the rest of her life.

50.   Ms. Vera used to live at the other end of the Palco Marsh encampment from her current campsite.  In late fall or early winter of 2015, EPD officers told her to move to the other end of the camp.  If she is evicted from the Palco Marsh on May 2, it will be very difficult for Ms. Vera to find housing because she has no income, has serious mental and physical health issues, lacks a legal identification card, and has no rental history in the last 30 years.  She also has a dog from whom she does not wish to be separated.

51.   Ms. Vera has sought and continues to seek housing other than at the Palco Marsh, but those efforts have been unsuccessful to date.

52.     Plaintiff Aubrey Short is a United States citizen residing in Eureka, California. He is homeless within the federal definition provided by 42 U.S.C. § 11302. Mr. Short is 41 years old, has been a Humboldt County resident since age 14, and has resided at the Palco Marsh for approximately two-and-a-half years. He became homeless after leaving a bad personal situation with no place else to go. Mr. Short was last employed at Pacific Choice Fisheries, where he worked for about four (4) months in 2002.

53.     For about two years, Mr. Short and his partner Lynette Vera lived on the opposite end of the Palco Marsh encampment from their present campsite. EPD officers walked through the camp often, told Mr. Short and Ms. Vera where they could stay, and told them they could camp there and not be bothered. About six months ago, during the winter, EPD officers began pushing both ends of the Palco Marsh encampment closer together, and instructed Mr. Short and Ms. Vera to move their tent closer to everyone else.

54.     Mr. Short has sought and continues to seek housing other than at the Palco Marsh, but those efforts have been unsuccessful to date.

55.     Plaintiff Marie Anntonette Kinder is a United States citizen residing in Eureka, California. She is homeless within the federal definition provided by 42 U.S.C. § 11302. Ms. Kinder is 57 years old, has been a Humboldt County resident for fifteen (15) years, and has resided at the Palco Marsh encampment on and off for fifteen (15) years. She became homeless when her roommate stole part of their rent money to buy drugs, leaving Ms. Kinder unable to make up the difference. Ms. Kinder was subsequently evicted and had nowhere else to go. Ms. Kinder lives at the Palco Marsh with her one-year-old dog. She has sought and continues to seek housing other than at the Palco Marsh, but those efforts have been unsuccessful to date.

56.     Ms. Kinder was diagnosed with attention deficit hyperactivity disorder ("ADHD") and OCD as a young teenager.

57.     Ms. Kinder lost her last job as a waitress in 2000, and has been unsuccessful in obtaining alternate employment since then despite her repeated efforts. She has no phone and no contact information, which makes it very difficult for her to secure employment, and her advanced age now limits her job opportunities.

58.     Several weeks ago, EPD officers gave Ms. Kinder a Notice to Vacate the Palco Marsh by May 2.   The officers who gave her the Notice to Vacate wrote Ms. Kinder's name and date of birth on her eviction notice and made her pose with it for a photograph.   EPD officers also instructed her to move her tent further into the center of the encampment, and said she would not be ticketed, arrested or forced out until May 2 if she remains in the compressed area. Ms. Kinder is fearful that she will lose her personal belongings when the police evict her from the Marsh on May 2, since last winter the EPD scooped up her camp with a frontloader and disposed of her shelter and all her personal items in a dumpster.

59.     Plaintiff John Travis is a United States citizen residing in Eureka, California.   He is homeless within the federal definition provided by 42 U.S.C. § 11302.   Mr. Travis is 53 years old, has been a resident of Humboldt County since approximately 2005, and has resided at the Palco Marsh encampment for approximately ten (10) years.   He lives at the Palco Marsh with his dog.   Mr. Travis has sought and continues to seek housing other than at the Palco Marsh, but those efforts have been unsuccessful to date.

60.     After giving him two citations for camping in other areas in the city, EPD officers instructed Mr. Travis to go to the Palco Marsh to camp instead.   Since beginning to compress the Palco Marsh encampment, EPD officers have instructed Mr. Travis to move his campsite three times, each time further into the central area of the Marsh encampment.

61.     Mr. Travis has lived outside for most of his adult life, ever since he was discharged from the United States Army.   Mr. Travis has been diagnosed as paranoid schizophrenic.   He worked as a mechanic on and off about 15 years ago, but it is difficult for him to work with other people.

62.     EPD officers have confiscated and destroyed Mr. Travis's camp and personal belongings on three separate occasions.   Each time, Mr. Travis has been forced to start over from scratch.   EPD officers confiscated and destroyed Mr. Travis's identification card, and he has been unable to obtain another.

63.     In November of 2015, EPD officers forced Mr. Travis to sign a MIST Homeless Tracking and Accountability brochure stating that he is trespassing by camping at the Palco

Marsh and that he can be cited or arrested. When EPD officers gave him the MIST brochure, they told Mr. Travis he had to sign it or move out of the Marsh. Several weeks ago, EPD officers gave Mr. Travis a Notice of Eviction informing him that he must leave the Palco Marsh by May 2 or face arrest. EPD officers made Mr. Travis pose for photographs twice while holding a copy of the Notice to Vacate.

64.     Upon information and belief, Defendant City of Eureka is a municipal corporation, organized under the laws of the State of California, with the capacity to sue and be sued. Upon information and belief, the City is the legal and political governmental entity responsible for the actions of the Eureka Police Department and its officials, agents, and employees.

65.     Upon information and belief, Defendant Eureka Police Department is the municipal agency responsible for policing the City and for enforcement of the Eureka Municipal Code (the "Code"), including Sections 93.02, 130.12 and 130.13, and California Penal Code Section 647(e). Upon information and belief, the EPD, through its officials, agents, and employees, has taken steps towards the enforcement of and will enforce Code Section 93.02 at the Palco Marsh encampment beginning on May 2, 2016.

66.     On information and belief, Defendant Andrew Mills has been the EPD's Chief of Police since November 2013. In his official capacity as Chief of Police, Chief Mills directs the EPD's administration and operation pursuant to the Code and guidelines set by the City. As such, he is responsible for the enforcement of Code Sections 93.02, 130.12 and 130.13. Upon information and belief, under Chief Mills's direction, EPD officials, agents, and employees have threatened Plaintiffs with camping and obstruction of public way citations pursuant to Code Sections 93.02, 130.12 and/or 130.13. Chief Mills is being sued in his official capacity.

### JURISDICTION

67.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367. Plaintiffs bring this action under 42 U.S.C. § 1983 to vindicate rights established by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as well as federal law. Plaintiffs also seek relief under the Declaratory

Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Plaintiffs' state constitutional and state law claims arise from the same occurrences as their federal constitutional claims and are within this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## VENUE

68.　　Venue in this action is proper in the Northern District of California under 28 U.S.C. § 1391(b), as the Defendants are located in the Northern District of California and all the events, acts and/or omissions giving rise to the claims complained of herein have occurred or will occur in this District.

## FACTUAL ALLEGATIONS

### Eureka's Homeless Population and Its Characteristics

69.　　In a January, 2013 interview, Eureka Mayor Frank Jager told the *Eureka Times-Standard* that "I think we absolutely have had a troubled past in dealing with the homeless.  It was a big issue when I first came on the Eureka City Council in 1992, and it's still a big issue now, despite all of the efforts we have made."  Mayor Jager admitted there was a lack of funding for "transitional services" for the homeless, and that municipal and county ordinances aimed at environmental and aesthetic impacts caused by homelessness made it difficult to effectively deal with the problem.

70.　　In its Mental Health Services Act Three-Year Plan for Fiscal Years 2014/2015, 2015/2016, and 2016/2017, the Humboldt County Department of Health and Human Services ("DHHS") stated that "Humboldt County has been designated as a community of high need by HUD due to the large number of people who are Chronically Homeless (CH) relative to size of population."

71.　　In its September, 2014 report to the Eureka City Council, Sacramento-based consulting group Focus Strategies noted that "[a]ccording to the most recently available data, the City of Eureka has an exceptionally high rate of homelessness, with approximately 222 people per 10,000 residents.  This is far higher than the national average and higher than in surrounding communities, including Humboldt County."  In the same report, Focus Strategies stated that "[n]ational data suggests that in a typical community homeless people represent about 1% of the

total population.  In Eureka, homeless people represent about 2.2% of the total population. . . .
While service providers and County agencies are working to meet the needs of this population,
the size of the population does not appear to be decreasing."  In analyzing the area homeless
population, Focus Strategies found "very significant numbers of unsheltered chronically
homeless people in Eureka."  Focus Strategies also found that "[p]eople living in the large
encampments in Eureka lack access to proper health and behavioral health care, are frequently
victims of crime, and are generally vulnerable to victimization."

72.     From January 28 to February 2, 2015, the Humboldt Housing and Homeless
Coalition ("HHHC") conducted its HUD-mandated biannual Point-in-Time Count of Humboldt
County's homeless population.  The Point-in-Time Count provides a "point-in-time" snapshot of
the number of individuals and families who were homeless in Humboldt County on the night of
January 27, 2015.  HHHC conducted its Point-in-Time Count using community volunteers.  The
Point-in-Time Count inherently undercounts the actual homeless population, since not every
homeless person in the survey area is sampled.  The count may in fact be a gross underestimate
of the actual number of homeless in Humboldt County, as it excludes all those in temporary
shelters, living in clean and sober housing, homeless children, and those who were simply not
polled.

73.     The 2015 Point-in-Time Count counted and surveyed 1,319 homeless individuals
in Humboldt County, 730 of them (56.3%) in Eureka.  In its 2015 Point-in-Time Count report,
the HHHC found that "[c]ompared to 2013, 2015 experienced an increased percentage of
respondents reporting that they had stayed in Arcata or Eureka," and "Eureka continues to have
the highest proportion of homeless people."  Of the 1,319 homeless persons surveyed in
Humboldt County by the 2015 Point-in-Time Count, 844 of them, or 64.3%, were unsheltered
(sleeping either in a car or on a street, outdoors, or in an abandoned building).  The HHHC
reported that "[t]he number of respondents who report being unsheltered has increased by 23.5%
since 2013 and by 32% since 2011."  Of the 844 unsheltered homeless identified by the 2015
Point-in-Time Count, 732 of them, or 86.8%, were camping.  The HHHC's 2011 Point-in-Time
Count found that Humboldt County had nearly twice the number of homeless persons per 1000

residents as Fresno County or San Francisco County, with the majority of the county's homeless concentrated in Eureka.

74.    Of the 1,319 homeless persons surveyed by the 2015 Point-in-Time Count, 632 of them (47.9%) reported having a disabling condition, 493 (37.4%) reported being a victim of domestic violence, 439 (33.3%) reported having a substance abuse disorder, 405 (30.7%) reported having a serious mental illness, and 22 (1.67%) reported having HIV/AIDS.  878 respondents (68.9%) reported that they had been continuously homeless for a year or more.

75.    In a section of its 2013-2014 Final Report entitled "Humboldt County Homeless Veterans," the Humboldt County Grand Jury found that "many homeless, including veterans, are afflicted by serious mental illness and alcohol and/or drug abuse. . . ."  The Grand Jury found that "[p]recise estimates of homeless people are difficult to obtain.  Various surveys indicate up to 2,000 individuals are homeless in Humboldt County, of which 20-35% are veterans."   The Grand Jury reported that "[v]eteran's organizations, mental health professionals, county officials, and veterans themselves all confirmed that there are a few shelters for women and children in Humboldt County but hardly any for single, adult men.  Few have places to sleep, protection from the cold or rain, or a place to take showers or defecate.  A report by the New Directions Program indicates most homeless individuals in encampments are longtime residents of Humboldt County."

76.    The Grand Jury's report noted that the "housing shortage for homeless is acute and rentals cost more than most homeless veterans can afford.  Many veterans have animals as companions, and we learned that the veterans typically take good care of their animals, however; owning a dog eliminates many housing options for the homeless veteran.  We were told by witnesses that permanent housing is extremely important for the mentally ill in order to be capable of benefiting from services that are available to them."  The Grand Jury also noted the conclusion of the 2014 Draft Housing Element of the Humboldt County General Plan Housing Element Update that the "housing needs of the very low income and the shelter needs of the homeless are not being adequately met and the supply of land available for multi-family housing is constrained by infrastructure limitations and zoning."

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

STACY COBINE *et al.* v. CITY OF EUREKA *et al.*

77.    In its findings, the Grand Jury concluded that "[a]ffordable adequate housing is scarce, and homeless veterans often sleep outdoors, or on the streets," that "[h]omeless veterans frequently encounter barriers preventing them from accessing services," and that "[p]articipants in permanent housing programs tend to be more successful in being mainstreamed back into the community than those in temporary or transitional housing."  In its formal recommendations, the Grand Jury stated that the "Humboldt County Board of Supervisors should designate in the Housing Element of the General Plan Update that certain areas be identified where sanctuaries and or campgrounds can be established," and that the "Board of Supervisors should encourage Department of Health and Human Services to obtain funding, jointly with other community agencies, through HUD and other sources to build 'micro-housing' villages and sanctuaries for homeless veterans."

78.    In September 2014, Sacramento-based consulting group Focus Strategies released its Homelessness Policy Paper commissioned by the City of Eureka.  The second sentence of its report observed that "[a]ccording to the most recently available data, the City is home to approximately 600 homeless people at any given point in time.  At 2.2% of the total population, the community has a higher rate of homelessness than national averages or than in surrounding Humboldt County."  Focus Strategies found that the homeless population in Eureka is comprised of "both 'transient' people who have recently arrived in the community as well as many people who are long-term residents of Humboldt County," and that the "vast majority are adults without children and many have chronic substance abuse and co-occurring mental health issues."

79.    Focus Strategies delivered a follow-up report entitled "Homeless Strategy and Implementation Plan" to the Eureka City Council in January 2016, and in that report stated that "[a]ccording to the 2015 [Point-in-Time Count], Eureka has by far the largest share of the overall homeless population in the County, and this has been the case over the last four counts (2009, 2011, 2013, and 2015).  The total number of homeless people compared to total population is also rather high.  National data suggests that in a typical community homeless people represent less than 1% of the total population.  In Eureka, homeless people represent about 2.7% of the total population.  Eureka's homeless population is also mostly unsheltered and highly visible,

with a large number of people living in the City-owned Palco Marsh area, as well as other smaller encampments around the City. Crime, violence and unsanitary conditions associated with this illegal encampment have been a source of intense concern in the community for many years."

### The Palco Marsh and the Palco Marsh Homeless Encampment

80.    The Palco Marsh is located on the eastern shoreline of Humboldt Bay, at the southern edge and within the coastal zone of the City of Eureka. In October 1985, the California Coastal Conservancy authorized a $610,000 disbursement to the City of Eureka to purchase the 39-acre Palco Marsh tract and surrounding properties for a "marsh enhancement project," subject to a conservation easement held by the Conservancy. In the same authorization, the Conservancy gave the City $30,000 in funding to develop its marsh enhancement plan, which was completed in 1987.

81.    In 1989, the California Coastal Conservancy approved the City of Eureka's marsh enhancement plan and authorized funding for the City to implement that plan. The City conducted some of its planned Phase I enhancement activities, but after discovering that grease and solvents from an engine repair facility had leached into the southeast corner of the Palco Marsh, certain Phase I enhancement plans were abandoned.

82.    In 1991, the City of Eureka developed its Phase II Enhancement Plan for the Palco Marsh, which provided for wetlands restoration and enhancement and allowed the City to lease part of the property to the Bayshore Mall for parking. The California Coastal Conservancy approved the Phase II enhancement plan in June 1992, and entered into a written agreement with the City of Eureka on August 12, 1992 in which the Conservancy allowed the Bayshore Mall parking lot to be built on marshland originally intended for restoration in exchange for the City taking specific restoration measures in other areas of the Palco Marsh. By 2000, many of the City's committed undertakings had yet to be fulfilled, despite the fact that the parking lot already had been built. In addition, the City ignored its promise only to use the land designated for the mall parking lot for the purpose of parking and parking alone – instead, it allowed a scrap metal

recycler and a noisy go-cart track to be built on the property as well, notwithstanding the fact that both uses were at odds with the goal of restoring the marsh to its natural state.

83.     The Palco Marsh homeless encampment is the largest homeless encampment in the region and likely the County.  Unsheltered homeless people in the City of Eureka have been camping in the Palco Marsh behind the Bayshore Mall for more than a decade.   At least as early as 2002, local newspapers were already reporting the presence of the Palco Marsh homeless encampment.  At the height of its population, the encampment was home to between 200 and 300 homeless individuals.

84.     In its January 2016 report to the Eureka City Council, consulting group Focus Strategies reported that at the Palco Marsh encampment, "there continues to be a group estimated at approximately 150-200 people here, including some children."  Focus Strategies reported that "[l]ittle data is available on the characteristics of the unsheltered homeless population in Eureka, but based on our site visit to the encampment as well as discussions with staff from the Mobile Intervention and Services Team (MIST), it appears that there is a very high proportion of people with serious mental illness and/or active substance use, as well as a significant number of people with criminal records.  This is a population that is very challenging to engage in services and also difficult to house."  In crafting their recommendations to the Eureka City Council, Focus Strategies stated in its January 2016 report that "we have tried to factor in the unusually complex needs of the population, recognizing that that a combination of housing and intensive services will be needed for a higher portion of the unsheltered population than is typical."

85.     In an April 14, 2016 letter and supporting document to the Humboldt County Board of Supervisors and the City of Eureka, the Humboldt County Human Rights Commission (a volunteer body formed by Humboldt County to advise on issues related to human rights) reported that "[m]ost of the Palco Marsh residents remaining in this location are chronically homeless" and "have the least capability to get out of homelessness due to a variety of reasons." The Human Rights Commission also noted that most remaining Marsh residents experience one or more mental or physical disabilities.

**Eureka's "Anti-Camping" Ordinance and Other Ordinances Targeting the Homeless**

86.   The City of Eureka's anti-camping ordinance, codified at Eureka Municipal Code Section 93.02, provides as follows:

### § 93.02  Camping Permitted Only in Specifically Designated Areas

(A)  Except as provided herein, no person shall camp in any public or private space or public or private street, except in areas specifically designated for such use.  ***CAMP*** shall mean residing in or using a public or private space for living accommodation purposes, such as sleeping activities, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), or storing personal belongings (including but not limited to clothing, sleeping bags, bedrolls, blankets, sheets, luggage, backpacks, kitchen utensils, cookware, and similar material), or making any fire or using any tents, regularly cooking meals, or living in a parked vehicle.  These activities constitute camping when it reasonably appears, in light of all the circumstances, that a person is using a public space as a living accommodation regardless of his/her intent or the nature of any other activities in which he/she might also be engaging.  ***PRIVATE*** shall mean affecting or belonging to private individuals, as distinct from the public generally.  All police officers are hereby charged with the enforcement of the camping provisions of this chapter.

(B)  For the purposes of this section:

    (1)  ***PUBLIC SPACE***.  Shall include the following areas:

        (a)  Any public park or public beach.

        (b)  Any public parking lot or public area improved or unimproved.

    (2)  ***PUBLIC STREET***.  Shall include any public street or public sidewalk including public benches.

    (3)  ***PRIVATE SPACE***.  Shall include the following areas:

        (a)  Any private park or private beach.

        (b)  Any private parking lot or private area improved or unimproved.

    (4)  ***PRIVATE STREET***.  Shall include any private street or alley including private benches.

The City of Eureka has declined to designate any public or private space within the city limits as a permissible site for camping under Eureka Municipal Code Section 93.02.

87.   Penalties for violation of the City's anti-camping ordinance are specified in Eureka Municipal Code Section 10.99.  In pertinent part, Eureka Municipal Code Section 10.99 provides as follows:

### § 10.99  General Penalty

(A)  It shall be unlawful for any person to violate any provision or to fail to comply with any of the requirements of this code or the provisions of any code adopted by reference by this code.  Any person violating any of such provisions or failing to comply with any of the mandatory requirements of this code shall be guilty of a misdemeanor.  Any person convicted of a misdemeanor under the provisions of this code shall be punishable by a fine of not more than $1,000 or by imprisonment in the county jail for a period not exceeding six months, or by both such fine and imprisonment. . . .

(B)  In addition to the penalties provided by this section, any condition caused or permitted to exist in violation of any of the provisions of this code, or the provisions of any code adopted by reference by this code, shall be deemed a public nuisance and may be summarily abated by this city, and each day such condition continues shall be regarded as a new and separate offense.

(C)  Each violation of this code expressly declared to be an infraction is punishable by:

> (1)  A fine not exceeding $100 for the first violation;
>
> (2)  A fine not exceeding $200 for the second violation of the same ordinance within one year;
>
> (3)  A fine not exceeding $500 for each additional violation of the same ordinance within one year.

88.     In addition to prohibiting camping everywhere within the Eureka city limits, the City of Eureka prohibits sitting or lying on public walkways and thoroughfares.  In pertinent part, Section 130.13 of the Eureka Municipal Code provides:

### § 130.13  Obstruction of Movement in Public Ways

(A)  *Prohibition*.  No person shall occupy any portion of a public street, sidewalk, curb or other public place so as to or [sic] interfere with the flow of pedestrian or vehicular traffic thereon, whether such person does so alone or together with one or more persons, or with equipment or personal property of any nature, and whether such person does so by standing, sitting, lying, or in any other manner.

(B)  *Penalty*.  Any person, after having been informed by law enforcement that the conduct violates this section and given an opportunity to stop the conduct, shall be charged with an infraction for the first violation subject to either a fine or community service.  Subsequent violations shall be charged as an infraction or misdemeanor at the discretion of the City Attorney. . . .

89.     Section 130.12 of the Eureka Municipal Code also prohibits sitting or lying on public sidewalks, curbs or streets in commercial districts between the hours of 6:00 a.m. and 11:00 p.m., including in the Downtown/Old Town Business District, the Northern Gateway Business Districts A-E, the Bayshore Mall Business District, the Henderson Center Business

District, the Myrtle Avenue Business Districts A-B, the Waterfront Business District, the Broadway Business Districts A-D, the Eureka Mall Business District, the Harris Street Business District, and the City Hall/Courthouse Business District.  Penalties for violation of Eureka Municipal Code Section 130.12 include being charged with an infraction for the first violation, subject to either a fine or community service, with subsequent violations charged as an infraction or a misdemeanor at the City Attorney's discretion.

90.    On October 20, 2015, the Eureka City Council voted to adopt an Open Space Property Maintenance Plan for the City of Eureka.  The Open Space Property Maintenance Plan imposed new rules for the Palco Marsh encampment, including prohibiting wooden pallets, building materials, propane or gas stoves and charcoal grills.  The Plan provides that "[i]llegal camping will be enforced [at the Palco Marsh encampment].  Violators will be provided notice of clean ups 72 hours in advance and are required to remove all physical belongings from the area to be cleaned of trash and debris by the City.  Failure to do so will result in citations and fines. The City of Eureka will provide storage containers to assist in these efforts."

91.    The Open Space Property Maintenance Plan's implementation plan specified that Eureka's municipal anti-camping ordinance "will not be aggressively enforced, but will be addressed as necessary" in the Palco Marsh encampment.  The Plan authorized the City to begin immediately removing some building materials (including wood pallets, large tarps, etc.) being used for shelters and only later propose and pass an ordinance forbidding their use, as well as the use of cooking implements and "other materials and equipment."

92.    The EPD frequently cites homeless people in Eureka for violations of the anti-camping ordinance.  One homeless man, Dane Cook, was cited by the EPD nine (9) times for camping, even without a tent or any camping supplies, and was eventually jailed for 120 days as a result of those citations.

**Prior Enforcement and Non-Enforcement of Eureka's Anti-Camping Ordinance**

93.    People have been living at the Palco Marsh encampment for more than ten years. On information and belief, Eureka Municipal Code Section 93.02 was drafted by staff and passed by the Eureka City Council with the explicit intention that it be used as a tool to remove the

homeless population camping on public lands, including the Palco Marsh. When Section 93.02 was adopted in 1995, just as now, the City's plans to evict homeless people living on public lands in Eureka did not include provisions sufficient to ensure that those who were evicted would be able to find shelter or housing in Eureka, or in any neighboring jurisdiction.

94.     In October 1997, Humboldt County conducted a sweep of a decade-old homeless encampment at the South Spit Jetty on the southern outskirts of Eureka. Humboldt County set up an armed, guarded and locked gate outside the Jetty encampment staffed with sheriff's deputies and security guards, issued special mandatory identification cards to Jetty residents, and required those ID cards to be shown to enter or exit the encampment. When the encampment was vacated, Humboldt County Sheriff's officers barred the residents' attorney from the area and moved in with shotguns and ATVs to evict the homeless. Four Jetty residents who were unable to collect their belongings and leave quickly enough were arrested. Pets belonging to the evicted Jetty residents were impounded and euthanized or adopted out, and all property not removed at time of the eviction was confiscated by county authorities. At the time that the approximately 300 residents of the South Spit Jetty were displaced, the Eureka Chief of Police made clear that its residents were not welcome to set up camp elsewhere in Eureka.

95.     Prior to the evacuation of the South Spit Jetty encampment, DHHS had been sending homeless to the South Spit Jetty for years when encountering them elsewhere in Eureka, telling them it was the safest and best place for homeless persons in Humboldt County. When the encampment was ultimately evicted, county officials cited unsafe health conditions as the reason for the sweep, despite the fact that these conditions had existed for years on end and had been ignored by the County and City alike.

96.     Beginning in approximately 2002, homeless people began camping at the Palco Marsh, often at the express instruction of EPD officers. The City of Eureka, the Eureka City Council, the Eureka Police Department ("EPD") and other local elected officials have been aware of the Palco Marsh encampment since its inception, as have local and regional press outlets. The City of Eureka and the EPD not only have been aware of the Palco Marsh encampment for more than a decade – for years, EPD also has been explicitly directing homeless

people found in other parts of Eureka to go to the Palco Marsh to camp instead.  EPD has informed homeless people they send to the Marsh and those already camping there that, so long as they remained within the camp boundaries drawn by EPD officers, they would not be cited or arrested for violating the City's anti-camping ordinance.

97.    EPD officers are often at the Palco Marsh encampment, whether on routine patrol, a weekly trash collection trip, or a periodic sweep of the encampment.  EPD officers frequently confiscate and dispose of the personal belongings and campsites of homeless residents of the Palco Marsh, using heavy moving equipment to deposit those items in a large dumpster.  EPD officers often claim the camps and personal items they have disposed of are "abandoned" or "discarded," when in actuality the campsite's owner is simply temporarily away from camp (e.g., in the hospital, at a social services office, out collecting firewood, etc.).  EPD officers have also confiscated and thrown away personal items and campsites belonging to Palco Marsh residents who are present and watching the officers destroy everything they own.  Property confiscated by EPD officers is usually not labeled to identify the owner, and is typically not held for anyone from whom it was taken.

98.    By 2013, the EPD was conducting periodic sweeps of the Palco Marsh homeless encampment and other homeless communities around Humboldt Bay and the outskirts of the city.  EPD Homeless Liaison Pamlyn Millsap told the Eureka *Times-Standard* that during such sweeps, "[v]isually abandoned stuff does get hauled off if it's on city property."  During sweeps of the Palco Marsh encampment, EPD forced homeless residents to leave the encampment during cleanup, issued citations to homeless residents for municipal code violations and arrested other homeless residents found to have active warrants.

99.    In 2013, City of Eureka began planning to evict the more than 100 homeless people then living at the Palco Marsh encampment, citing environmental damage caused by trash left at the encampment and public safety concerns.  The City also began cutting back vegetation in the marsh area to better allow EPD officers to monitor and discourage camping.

100.    On December 4, 2014, the Eureka Public Works Department cleared out homeless encampments in the greenbelt by the foot of Del Norte Street, using inmate work crews and city

employees to remove debris and unclaimed belongings with a backhoe. City workers returned to the encampment at the foot of Del Norte Street on January 29, 2015 and conducted another sweep operation.

101.    On April 15, 2015, EPD officers and other law enforcement agents swept through the Palco Marsh encampment and made nearly 30 arrests. During the sweep, EPD officers informed Palco Marsh residents that they had two (2) weeks to vacate the encampment. The City of Eureka and the EPD later relented before the designated evacuation date and indefinitely postponed eviction of the encampment.

102.    At their regular May 19, 2015 meeting, the Eureka City Council voted to approve a one-night waiver of Eureka Municipal Code Section 93.02 to allow overnight camping in Halvorsen Park on the evening of May 23, 2015 for participants in the Kinetic Sculpture Race.

103.    Beginning in July, 2015, the EPD and the City of Eureka established a schedule for and began providing weekly maintenance and cleanup service at the Palco Marsh encampment and other city-owned bayfront locations. At approximately the same time, the City began hosting monthly "Service Fairs" for homeless Palco Marsh residents in the Bayshore Mall's north parking lot, at which Marsh residents could speak with representatives of local service providers including the Open Door Clinic, Eureka Rescue Mission, and DHHS.

104.    On July 15, 2015, Eureka City Manager Greg Sparks issued a press release entitled "Illegal Camping Enforcement," stating that the "City of Eureka will be enforcing the 'No Camping' ordinance and the Eureka Police Department gave a warning 'notice to vacate' to those camping on public or private lands within the City of Eureka. Those specifically camping behind the area of the Bayshore Mall were warned to remove all personal property within ten days." The press release stated further that the "City can no longer afford to ignore this illegal activity. The risk associated with the ongoing illegal activity is too great of a liability to the City of Eureka. In addition, the City has received complaints from the Environmental Protection Agency, California Coastal Commission and residents concerning the mounds of trash and resulting pollution due to the homeless population that lives behind the Bayshore Mall."

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

STACY COBINE *et al.* v. CITY OF EUREKA *et al.*

105.    Also on July 15, 2015, EPD officers posted a "Notice to Vacate" at all camps in the Palco Marsh, telling residents they had ten (10) days to leave with all their belongings or "face prosecution."  The city ultimately did not vacate the encampment on that date, but stepped up law enforcement at the Marsh and continued conducting weekly trash cleanups.

106.    On July 21, 2015, the Eureka City Council heard reports from Eureka City Manager Greg Sparks, Eureka Parks & Recreation Director Miles Slattery and EPD Chief Andrew Mills on enforcement of the municipal anti-camping ordinance at the Palco Marsh encampment and the City's plans to begin weekly cleanup of the area.  EPD Chief Mills told the City Council that "[w]e're not going to arrest our way out of this problem, but there must be some sort of social control.  If that's the only leverage we have at this time, then we have to use it."  After hearing those staff reports, the City Council voted to approve staff recommendations to continue with weekly cleanups, provide ten-day notices to vacate and enforce the anti-camping ordinance at the Palco Marsh.

107.    In September 2015, local homeless advocate Janelle Egger inquired with EPD Captain Brian Stephens regarding the threatened confiscation of a homeless woman's campsite and belongings, and Captain Stephens provided Ms. Egger with a written letter in response to her inquiry.  In that letter, Captain Stephens stated that while the EPD was "moving forward with the enforcement of the camping laws both as stated in the California Penal Code and the Eureka Municipal Code. . . . [T]here are certain areas [where] we will be doing enforcement operations.  These will not be sweeps but we will enforce the current laws. . . . We have identified one area where we will be doing less enforcement, unless there is a rise in violence, that we are telling people to go.  This is the area directly west of the parking lot were [sic] the services fair will be held, north to the area of Vigo Street.  This area will still see Police presence but will not be a focus area of enforcement."

108.    On September 19, 2015, in an article entitled "Multiple Agencies Push Homeless Campers to a 'Safer' Place," Linda Stansberry of the Eureka *Times-Standard* described the plight of a local woman who had been homeless for three years, and reported that the "Eureka Police Department is urging her, and others, to move to the north part of the Palco Marsh.  While

previous plans to establish a 'sanctuary camp' for the city's homeless were abandoned by the city, it appears as though an unofficial 'safe place' is in fact being encouraged. A rash of recent violence among the homeless population camped in Eureka's marshes and forested areas has prompted the agency to consolidate campers in the flat, open section north of the Bayshore Mall." The *Times-Standard* reported that "Mills said he is now directing his officers to move people to one spot that's more accessible to police, fire and medical services. Right now, he said, there isn't adequate housing for every person who is camping. . . . Police officers have visited the marsh and other areas of the city instructing campers to move. 'We're moving forward,' said Mills. 'We won't take "no" for an answer.'"

109.    On September 21, 2015, in an article entitled "Homeless in Humboldt Update: Death, Drones and Rallies," Linda Stansberry of the Eureka *Times-Standard* reported that there are "camps still firmly entrenched in the wooded area just behind the mall, an area where the Eureka Police Department is preparing to cite and arrest campers. EPD is encouraging people to move north, to the flat area adjacent to the Bayshore Mall's overflow parking lot, which would provide easier access for medical and police personnel. . . . 'We don't have adequate housing for everybody who's houseless,' he said. 'I have directed officers to move people toward [the] pole shed area, where we have more access for police, fire and medics.'" Stansberry also reported that a "woman whose camp at the corner of Sixth and T streets was served notice by EPD officers last week said she was told to 'move to the Devil's Playground.'"

110.    In a September 25, 2015 blog post on the EPD's website, subsequently republished in the October, 2015 edition of *Eureka eNews* (the City of Eureka's official monthly newsletter), EPD Chief Mills wrote that "to minimize and reduce the [crime] problem EPD is directing the homeless to move to an area more accessible by police, fire and medics. This area is near the poll [sic] shed area along the bay. Many have cooperated but those who refuse will be cited and then arrested. . . . We are also strictly enforcing the law elsewhere in the city to prevent displacement. By condensing the population into a fairly large but controllable area it allows the police to treat it as a 'hot spot.' Some research would suggest that as little as 20 minutes of

treatment a few times a day will help to control and reduce crime and criminal opportunity in hot spots."

111.    In or about November 2015, the EPD and DHHS began distributing the MIST Homeless Tracking and Accountability brochure to Palco Marsh residents.  The front of the brochure said "Eurekans care for you and want you to succeed.  Working together we can help you rise above your current circumstances . . . no matter how difficult they might be.  **BUT**, We need your help."  The reverse side of the brochure contained a space for the name, date of birth and signature of the Palco Marsh resident who received it.  By signing the brochure, the Palco Marsh resident attested that "I understand that finding a place to live is my responsibility.  Camping on City or private property without permission is illegal and I can be cited or arrested. . . . It is my desire to diligently seek housing or return to my city of origin.  By signing below I acknowledge and agree.  This is not permission to trespass, camp illegally or litter."  Inside the brochure was a list of local shelter, transitional housing and homeless services resources and their phone numbers.

112.    In December, 2015, the EPD began distributing a flyer to residents of the Palco Marsh entitled "City of Eureka Open Space Rules."  The flyer stated that under the City's newly adopted Open Space Property Maintenance Plan, building materials, wood pallets, large tarps attached to trees, propane or gas stoves and charcoal grills were prohibited at the Palco Marsh encampment, and that "any of the above referenced material will be removed from City property and discarded."  The flyer also included photographs showing "examples of structures that will be removed if found on City property."  The flyer stated further that litter, waste and recyclables would be picked up at the Marsh every Thursday, and that during the weekly trash pick-ups, "any property that is believed to be abandoned will be **immediately discarded**," and "any property that is believed to be a health and safety hazard shall be removed **immediately and discarded**."  The flyer stated that property confiscated by EPD that is not discarded may be reclaimed by phoning to schedule a date and time for pickup "or at the large Conex box located in the north parking lot of the Bayshore Mall.  Any property that is not reclaimed within ninety (90) days of removal will be disposed of."  The flyer concluded with the statement that "any

person(s) failing to comply with this notice will be in violation of state law including the California Penal Code, the California Vehicle Code, and the Eureka Municipal Code and **will be prosecuted**."

113.   On December 29, 2015, EPD Captain Steve Watson sent an email to local homeless advocate Janelle Egger and others with the subject line "Courtesy Notice of Palco Marsh campsite change," "forwarding a copy of our latest Palco Marsh et al. map showing where the zero tolerance/maximum enforcement areas are located," and stating that "[a]bandoned property and hazardous items will be disposed of as per current protocols (see the City's Open Space Rules document)." Chief Watson stated further that "[w]hile we cannot and will not authorize illegal lodging/activity anywhere on City property, folks willing to <u>fully</u> and <u>immediately</u> comply with the rules will not presently be subject to enforcement attention <u>if</u> they relocate toward the central pole shed property area. . . . They must understand, however, that we are going to be strictly enforcing the open space rules. **Non-compliance = enforcement = removal**. I would encourage those being displaced to use this as an opportunity to seek housing or lawful shelter elsewhere (but NOT attempt to camp elsewhere in Eureka). . . . As of today, Officers Rabang and Hubbard are actively beginning [the] process of enforcing the rules and moving those who are cooperative and desirous south into a more centralized and manageable location.'"

114.   On December 30, 2015, EPD Captain Steve Watson told the *Lost Coast Outpost* that the EPD would soon be shrinking the size of the Palco Marsh homeless encampment again, and said that while the City was "not giving anyone permission to camp," people who follow the City's open space rules, commit no other crimes and pitch tent in the City-designated low-level enforcement areas of the Palco Marsh would not be arrested.

**The Lack of Housing Alternatives in Eureka and in Humboldt County Generally**

115.   For at least 10 years, homeless people have resided in an encampment at the Palco Marsh. During the more than a decade that the Palco Marsh encampment has existed, the small efforts made by the City of Eureka to address its homelessness problem has done little to provide housing for the Palco Marsh residents or alternative places for Palco Marsh residents to sleep or

seek shelter.

116.    Eureka has a small number of emergency shelter beds, transitional housing units, and permanent supportive housing units for homeless persons, but these limited resources are woefully insufficient to meet the overwhelming need in Eureka and surrounding communities. The HHHC's 2015 Point-in-Time Count found 730 homeless people in Eureka, approximately 470 of them unsheltered on the night of the Count.  For those 730 homeless people, the HUD 2015 Continuum of Care Homeless Assistance Programs Housing Inventory Count Report for Humboldt County found only 342 year-round emergency, transitional, safe haven, rapid re-housing, and/or permanent supportive housing beds in all of Humboldt County.   In a July 23, 2015 *North Coast Journal* article entitled "Three Heads for Every Bed: Eureka Tells Marsh Homeless to Move On, But Where," Linda Stansberry reported that according to a 2014 Humboldt Housing and Homeless Coalition inventory of the total number of year-round beds available in emergency, transitional and permanent supportive housing, Eureka's combined facilities "collectively hold about 236 beds, not enough to shelter even half the town's total homeless population.  Of all these facilities, only the [Eureka] Rescue Mission offers same-day, walk-up services to those in need of a roof over their heads."

117.    There are only a few emergency shelter spaces available for couples anywhere in Humboldt County, and some of those beds are restricted to couples who are legally married. Some shelters will not accept persons with physical disabilities or mobility impairments.  Very few shelter facilities accept people with dogs, even if they are service animals for people with disabilities.  All of the emergency shelters in Eureka also impose strict time limits on the length of time a person is allowed to stay, some as short as two days.  Even if some of the homeless residents of the Palco Marsh are able to obtain an emergency shelter bed or a temporary housing unit, they are likely to be back on the street after a short period of time due to the lack of permanent supportive housing services in the City of Eureka.

118.    Eureka currently has five (5) emergency shelter[1] locations with a total of

---

[1] Emergency shelter beds should not be considered "housing."  Housing provides a place for a person to stay 24 hours a day, seven days a week -- not just a place to sleep at night, where the

approximately 233 beds and/or camping spots: (1) the Eureka Rescue Mission, which provides 90 beds for homeless men and 35 beds for homeless women and children year-round; (2) 35 emergency cots in the St. Vincent de Paul's dining hall, available to homeless single men in Eureka only from April 2016 through October 2016; (3) Humboldt Domestic Violence Services ("HDVS"), which provides emergency shelter with a maximum two-day stay at an undisclosed Eureka location to women and their children who are victims of domestic violence; (4) Our House, a six-bed emergency shelter for homeless youth ages 12-17; and (5) the city-owned parking lot at the corner of Washington and Koster Streets, where 50-60 homeless adult men and women may sleep overnight from April 11 through June 10, 2016.  Additionally, the emergency shelter beds available in the City of Eureka are not simply lying vacant – these facilities are currently being used by some of the 730 homeless Eureka residents who do not live at the Palco Marsh encampment, and all of them have consistently high occupancy rates.  There has not been any time during the last five years that the emergency shelters in Eureka could have accommodated an additional 140 people (the remaining population of the Palco Marsh encampment) at once, or anything even approaching that number.

119.    In addition, some of these facilities admit only specific groups of homeless individuals, such as runaway youth or domestic violence victims.  Of these approximately 233 shelter beds/camping spots, only 178 of them will exist after June 10, and only 143 of them will exist after October 2016.  There is no 24/7 emergency shelter, where residents are not required to leave during the daytime hours, anywhere in Humboldt County.

120.    Emergency shelter facilities in Humboldt County have numerous rules and restrictions that make it difficult for homeless Palco Marsh residents to take advantage of their services.  Eureka's largest emergency shelter, the Eureka Rescue Mission, provides a good example of the restrictions associated with shelter accommodations.  The Eureka Rescue Mission is a faith-based nonprofit that operates both a Men's Emergency Overnight Shelter and a Women and Childrens' Emergency Overnight Shelter, and is the only place in Eureka where both men

homeless are forced to leave during the day with all their belongings, and must line up again for a bed in each night with no guarantee of securing one.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

STACY COBINE *et al.* v. CITY OF EUREKA *et al.*

and women can drop in and receive housing for the night without a referral. The Men's Shelter has capacity for a maximum of 90 single men, while the Women and Children's Shelter accommodates a maximum of approximately 35 women and children. Most problematically, the Eureka Rescue Mission is a highly religious environment that subjects the homeless people who stay there to religious sermons and other religious counseling. The Eureka Rescue Mission self-describes its purpose as "proclaim[ing] the Gospel of Salvation to those in need of spiritual rebirth." The Women and Children's Shelter describes itself as providing a "sober, structured environment with daily responsibilities and Bible study," and explains that "the key aspect, the most important and meaningful part of this ministry for our guests, is solid and consistent exposure to the Gospel of Jesus Christ." Eureka Rescue Mission Executive Director Bryan Hall told a local TV station in early April, 2016 that homeless residents in its transitional housing program have, by the time they exit the program, "had over 600 hours of Bible teaching by local pastors." Many residents of the Palco Marsh encampment do not consider themselves to be Christians, and view the services offered by the Eureka Rescue Mission as a coercive form of religious indoctrination.

121.    In addition, both the Men's Shelter and the Women and Children's Shelter require picture identification (which many homeless individuals do not have), and require that those wishing to stay there be sober and take and pass a breathalyzer test. The Women and Children's Shelter also limits its beds to women with or without children under the age of 12; women with teenage children are not permitted, and neither are women in wheelchairs. Both the Men's and Women's Shelters are open only during the evening hours, and those who stay there overnight must leave in the early morning hours and find somewhere else to be during the day. Service or other animals are not permitted. The Rescue Mission has a two-bag limit for allowable personal belongings.

122.    Similar restrictions are associated with Eureka's other emergency shelter facilities. The City has authorized St. Vincent de Paul to provide cots set up in its dining room for up to 35 single men to sleep between the hours of 8:00 p.m. and 7:00 a.m. for a period of six months beginning April 11, 2016. No dogs or other pets are allowed, and men sleeping at St.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

STACY COBINE *et al.* v. CITY OF EUREKA *et al.*

Vincent's must take all their belongings with them when they leave for the day and line up again at night to secure another bed for the evening.  For a period of 60 days, from April 11 to June 10, 2016, the City of Eureka will also make available a city-owned parking lot at the corner of Washington and Koster Streets for approximately 50-60 homeless adults to sleep at night.  The lot will be open only between the hours of 8:00 pm and 7:00 am, and all who sleep there must pack up all their belongings and be gone by 7:00 a.m.  The parking lot will include dumpsters and port-a-potties, but no other City resources will be put into the site.

123.   A limited number of transitional housing and permanent supportive housing units are also available for homeless residents in Eureka and Humboldt County, but those units are typically full at any given time, and the imminent May 2 eviction of all Palco Marsh residents leaves insufficient time for them to locate and obtain approval to occupy a transitional and/or permanent supportive housing unit.  Like Eureka's emergency shelter facilities, transitional housing resources available in Eureka generally serve only limited segments of the population and impose a host of restrictions on the individuals taking advantage of their services.  The City of Eureka's 2014-2019 Housing Element, part of the City's General Plan Update, reports a total of approximately 270 beds in Eureka in transitional and permanent supportive housing facilities that serve the needs of women, youth, veterans, and recovering drug and alcohol addicts.  Of those 270 beds, 95 are reserved for persons in drug and/or alcohol recovery programs, 46 are reserved for veterans, and 54 are set aside for teenagers and young adults.

124.   The largest transitional housing facility in Eureka, the Multiple Assistance Center ("MAC"), is operated by the Redwood Community Action Agency ("RCAA") and opened in April 2005 serving single adults and families.  In 2008, the MAC refocused to providing transitional housing exclusively for families with children, with capacity up to 90 people.  On July 1, 2015, the MAC shifted its focus away from serving families and began providing transitional housing and rapid re-housing services for single adults, with a shorter length of stay. The MAC currently provides housing for a maximum of only 40 single adults or couples for a maximum of 30 days, with the ability to apply for an additional 30-day extension.  To be admitted to the MAC, a referral from MIST or another governmental agency and a County case

manager are required.  The intake process at the MAC can take two weeks or more.  Focus Strategies' January 2016 Report to the City of Eureka found that since the MAC's July, 2015 reorientation to serve single adults and transition them into permanent housing, its "efforts thus far have been hampered by a lack of housing options."

125.    The North Coast Veterans Resource Center ("NCVRC"), a division of Veterans Resource Centers of America, operates transitional housing facilities for veterans in Eureka.  NCVRC's transitional housing facility provides 36 beds for up to a two-year stay and typically has a 95% occupancy rate; only one bed is currently available.  NCVRC's Behavioral Health Housing facility allows 16 veterans to stay for up to 90 days, and typically has an 85%-95% occupancy rate; no beds are currently available at this facility.  Some veterans are automatically declined for NCVRC's housing services, including sex offenders and those with active arrest warrants.  Veterans must also be sober for two weeks before they can be accepted into one of NCVRC's programs.

126.    Other transitional housing facilities in Eureka, like the NCVRC, serve only specific segments of the homeless population.  The RCAA Youth Services Bureau's Transitional Housing Plus ("THP Plus") program, for instance, is a transitional housing facility for six 18 to 24 year olds who have been emancipated from the foster care or probation systems.  In January, 2016, RCAA opened its Bridge House, a transitional housing facility in Eureka for five one- and two-parent families.  The facility is equipped to house a maximum of 24 persons.  All transitional housing provided by RCAA requires specific referrals from designated County services agencies to qualify for admission.  North Coast Substance Abuse Services (Crossroads) provides transitional housing in Eureka for chronically homeless women with substance abuse disorders or with mental illness and substance abuse disorders.  The Betty Kwan Chinn Day Center provides transitional housing for up to five (5) individuals for up to a one-year stay.

127.    On April 19, the City of Eureka also approved a plan to convert five to seven 40-by-8 foot metal shipping containers into housing for up to 40 homeless adult men and women in a fenced area of a private lot at the corner of West Third and Commercial Streets.  The facility will have portable toilets and trash bins on site. These metal shipping containers have only

started being retrofitted, and it is unclear whether they will be available for occupancy by the May 2 eviction date.  Even with these limited additional resources, however, there simply are not enough shelter beds or other alternative housing resources to house Eureka's unsheltered homeless population, including the residents of the Palco Marsh encampment.

128.    Permanent supportive housing facilities for the homeless are extremely limited in Eureka and Humboldt County, with very few if any vacancies at any given time.  Enrollment in permanent supportive housing programs is also difficult and requires significant lead time for admission.  DHHS oversees two HUD-funded, permanent supportive housing programs in Humboldt County, one of them for chronically homeless persons with HIV/AIDS (4 units), and the other for chronically homeless persons with serious mental illness who are receiving services from county mental health providers (11 units).

129.    Subsidized housing in the City of Eureka and in Humboldt County more broadly is also severely limited and almost entirely occupied.  It is even more difficult to obtain subsidized housing in Eureka than it is to obtain an emergency shelter bed.  The City of Eureka's 2014-2019 Housing Element reports that the Eureka Housing Authority owns and operates "198 federally assisted low-income public housing units located on 14 scattered sites within the City" and "51 units of Section 8 New Construction family units . . . on three sites."  In its September, 2014 report to the Eureka City Counsel, consulting group Focus Strategies reported that a total of 200 public housing units exist in Eureka, and that 500-600 Housing Choice Vouchers (formerly Section 8) were in use in Eureka at the time.  The City of Eureka's 2014-2019 Housing Element reports higher numbers of Housing Choice Voucher recipients, with 947 in the City of Eureka.

130.    These subsidized housing vouchers are currently being used by other low-income citizens of Eureka.  The Humboldt County Housing Authority's Section 8 Housing Choice Voucher wait list is more than two years long, is currently closed, and was last open on March 25, 2015.  Eureka experiences very low turnover in its subsidized housing units, and the few units that do exist are typically maintained in very poor condition.  In order to be selected for Section 8 housing, applicants need good credit and a good rental history.  Background checks are also required of all Housing Choice Voucher recipients.  A limited number of Veterans Affairs

Supportive Housing ("VASH") vouchers are also in use by Eureka veterans in need of subsidized housing assistance, but all 79 VASH vouchers are currently in use.

131.    Affordable housing for low-income households in Eureka is equally scarce.  The cost of market rate rental housing in Eureka and Humboldt County is prohibitively expensive for all but those of moderate-income or greater.  The City of Eureka's 2014-2019 Housing Element bluntly acknowledges the lack of affordable housing in Eureka.  Based on the median gross rent in Eureka of $802/month reported by the 2008-2012 American Community Survey ("ACS"), the City of Eureka's 2014-2019 Housing Element acknowledged that "rental units in the City are generally only affordable to moderate-income households.  The maximum rent affordable to very low-income households is $785 (for a five-person household) which is 2 percent less than the median rent in the City according to the 2008-2012 ACS.  Most low-, very low- and extremely low-income households are priced out of the rental market in Eureka, including three, two, and one person households."  The City's 2014-2019 Housing Element noted further that "[e]xtremely low-income households and households with special needs have limited housing options in Eureka.  Housing types appropriate for these groups include: emergency shelters, transitional housing, supportive housing, and single-room occupancy ("SRO") units."  The Housing Element recognized that "Humboldt County and the City of Eureka have a higher than average rate of homelessness as compared to other regions of the State," and the "high number of lower income households indicates that there is a need for affordable housing units in the City."  The Housing Element stated that "[f]actors contributing to the increase in homeless persons and families and those in need of shelter and transitional housing include: the lack of housing affordable to very low- and low-income persons; increases in unemployment or under-employment; reductions in government subsidies; deinstitutionalization of the mentally ill; domestic violence; drug addiction; and dysfunctional families."

132.    The City's 2014-2019 Housing Element also observed that "[b]ased on the median home price of $227,500 reported in September 2013, only above moderate-income households could afford to purchase a home.  Generally, extremely-low, very low-, low- and even moderate-income households of all sizes could not afford to buy a home at the average

sales price." Based on the median gross rent in Eureka of $802/month reported by the 2008-2012 ACS, the Housing Element concluded that "rental units in the City are generally only affordable to moderate-income households. The maximum rent affordable to very low-income households is $785 (for a five-person household) which is 2 percent less than the median rent in the City according to the 2008-2012 ACS. Most low-, very low- and extremely low-income households are priced out of the rental market in Eureka, including three, two, and one person households."

133.    The June 2015 Humboldt County Grand Jury Report on Homelessness in Humboldt County echoed the Housing Element's grim assessment of the availability of affordable housing in Eureka and Humboldt County, stating that "[c]oncern for the lack of available housing in Humboldt County is also a common theme among service providers, government agencies, and the homeless themselves." The Grand Jury found that "[a]ll efforts toward housing the homeless in Humboldt County are flawed by the critical lack of affordable homes. The final step in Eureka's Four Step Plan and the Multiple Assistance Center's newly forced 30 to 60 day program is to permanently house the homeless. The waiting lists for Section 8 and public housing are closed due to the lack of permanent housing. The lack of affordable housing was cited as a reason for the City of Eureka to rehire Focus Strategies to create a second report to evaluate and compile a list of available affordable homes in Eureka. The 2013 Update to the Humboldt County 10-Year Plan to End Homelessness identifies increasing the availability of stable, affordable housing as a top priority."

134.    Although Eureka and Humboldt County's affordable housing resources are scarce, the need for affordable housing is acute given the number of extremely low-income, very low-income, and low-income households in the region. The United States Department of Housing and Urban Development ("HUD") has adopted the following income categories based on the Median Family Income ("MFI") of a Metropolitan Statistical Area ("MSA"): (1) extremely low-income – 30 percent or less of the area MFI; (2) very low-income – 50 percent or less of the area MFI; (3) low-income – between 51 and 80 percent of the area MFI; (4) moderate-income – between 81 and 120 percent of the area MFI; and (5) upper-income – greater than 120

percent of the area MFI.  According to the 2010 Census, the median household income in Eureka was $32,191 per year.  The 2014 MFI for the Humboldt County MSA was $52,100.

135.    According to Comprehensive Housing Affordability Strategy ("CHAS") data compiled by HUD for the time period 2008-2012 (the most recent available), out of a total of 11,055 households, 3,305 of them were extremely low- or very low-income and 2,115 were low-income.  As the City of Eureka's 2014-2019 Housing Element noted, "[g]enerally, Eureka's unskilled labor wages come very close to the extremely low wage earner level, and include occupations such as child care workers, food preparation and serving, manicurist and pedicurist, and restaurant host and hostess."

136.    According to both state and federal standards, households paying more than 30 percent of their income for housing are "overpaying."  The City's 2014-2019 Housing Element explains that "HUD defines affordable housing costs as contract rents or mortgage payments, including taxes and insurance, but not utilities, that are equal to or less than 30 percent of the gross income of very low-, low-, and moderate-income households."  As the Housing Element recognizes, "[l]ower income households with a burdensome housing cost are more likely to become homeless."  The Housing Element indicates that, based on 2010 Census data, almost 60% of Eureka rental households were spending more than 30% of their monthly income on housing costs.

137.    According to the Humboldt County 2014-2019 Housing Element, "[f]or those at the lowest end of the pay scale the problem of overpayment [for rent in Humboldt County] is severe.  Many individuals on government assistance need to pay more than 100% of their income for a room in a house.  A Calworks family of four cannot even afford a studio: a 2013 survey by the Humboldt County Planning and Building Department showed that the average rent for a studio was $602.  A person on General Relief, and a Calworks family of 2 or 3 persons earn less than that each month."  The Humboldt County 2014-2019 Housing Element also noted that "[a]n average senior [S]ocial [S]ecurity recipient earns $866 each month, which [is] less than the average rent for a two (2) bedroom home ($928)," and a "minimum wage earner working fulltime earns $1,360, which means they will be paying 50% of their income for an average one

(1) bedroom house, $684." The County Housing Element noted further that "affordability of existing housing stock decreased dramatically during the previous Housing Element period." The Humboldt County Regional Housing Needs Allocation Plan for 2014-2019 also states that the "City of Eureka was the only jurisdiction [in the County] to report a loss of affordable housing units due to the expiration of covenants in the previous RHNA cycle. No data was provided regarding the number of units at risk for the next cycle."

138. It is virtually impossible for a homeless person, on their own, to obtain one of the scarce affordable housing units available in Eureka. Instead, a knowledgeable caseworker or advocate must be involved to help that person navigate the system. In addition, in order to get housing, the person must have a demonstrable income. While that requirement could potentially be met with SSI disability benefit income, people without a recent work history can end up waiting for a period of anywhere from three months to three years in order to be approved for SSI. SSI decisions are also based on medical evidence of disability. If a homeless person has not received consistent medical care over the years, establishing disability can be very challenging. Almost all of the chronically homeless peopld who apply for benefits are eventually approved if they have access to an attorney or other advocate who can help them with the application process, but it still takes at least an average of one year for SSI claims to be approved.

139. In addition, homeless individuals experience a multitude of barriers that often prevent them from obtaining stable and secure rental housing. These obstacles include a lack of legal identification (e.g., no driver's license, ID card, birth certificate or Social Security card), poor or no previous credit or rental history, and no or prohibitively low regular income. All of these problems are commonly experienced by homeless residents of the Palco Marsh.

140. As a result, homeless people who wish to sleep and shelter in the City of Eureka, and who are unable to take advantage of the very limited emergency, transitional or permanent supportive housing, or subsidized or affordable housing resources are forced to camp. If they lie in a sleeping bag or set up a tent anywhere within the Eureka City limits (except for the parking lot at Washington and Koster where a small number of homeless may sleep at night for 60 days),

they will be in violation of Eureka Municipal Code Section 93.02 and risk being cited and arrested.  If they lie on the sidewalk, they are in violation of Eureka Municipal Code Sections 130.12 and/or 130.13 and risk being cited and arrested.

141.    Although the City of Eureka has struggled with an unusually large homeless population for decades, and its lack of affordable housing opportunities is longstanding, Eureka has failed to make a serious effort to increase the supply of affordable and/or subsidized housing. In recent years, the City of Eureka has retained Sacramento-based consulting group Focus Strategies to analyze and provide recommended strategies for addressing homelessness-related issues.  While Focus Strategies strongly urged Eureka to follow a "Housing First" approach that focuses on increasing the availability and affordability of stable, long-term housing (including permanent supportive housing) to homeless individuals and families, and specifically warned the City against vacating its existing homeless encampments while housing is being built, the City of Eureka has followed an approach 180 degrees removed from Focus Strategies' recommendations by deciding to evict all residents of the Palco Marsh encampment on May 2nd and failing to increase the availability of affordable and/or subsidized housing units in any meaningful way. Instead of spending money to increase the stock of affordable, subsidized, and permanent supportive housing units, the City of Eureka has opted to overemphasize funding for homelessness management services instead of attempting to solve the core problem driving people to homelessness – lack of housing.

**Eureka's Historical Response to Homelessness and its Current Plan for**

**Eviction of the Palco Marsh Encampment**

142.    In 2009, DHHS issued a document entitled "Humboldt County Ten Year Plan to End Homelessness: Phase I."  The Ten Year Plan, as part of its recommended next steps, noted that homeless people should be rapidly rehoused, that the homeless should be assisted in "securing enough income to afford rent," and that "[p]ermanent supportive housing is needed to meet the needs of all chronically homeless, homeless, and extremely low-income people."  Other recommendations included developing plans to "increase emergency shelter beds that provide temporary lodging until transitional and permanent supportive housing units can be developed,"

"creat[ing] more low-income, very low-income, and extremely low-income housing units," "expand[ing] rental subsidies and diversion options for those eligible," "creat[ing] more decentralized community-based transitional housing units linked to supportive services," "creat[ing] more permanent supportive housing units," "increas[ing] the supply of housing affordable to those who are homeless or at risk of homelessness," "adopt[ing] Housing First/Rapid Re-Housing models within available resources to ensure rapid placement from homelessness into housing," and "increase[ing] availability of transitional housing units for [] transition age foster youth."

143.    In July, 2011, DHHS released the Humboldt County Ten Year Plan to End Homelessness – Phase II: Strategies and Action Steps.  That report presented the recommended objectives and action steps developed by the HHHC in accordance with Phase I of the Ten Year Plan, in light of the themes and objectives presented in the United States Interagency Council on Homelessness's ("USICH") 2010 report entitled *Opening Doors: Federal Strategic Plan to Prevent and End Homelessness.*  The DHHS began its Phase II report by noting that "[h]omelessness continues to be a significant human problem in Humboldt County."  The Phase II report recommended a number of objectives aimed at reducing homelessness in Humboldt County, including increasing the availability of affordable and permanent supportive housing and reorienting services for managing homelessness to focus on rapid re-housing efforts instead.

144.    In Fall of 2013, the City of Eureka engaged Focus Strategies, a Sacramento-based consulting group, to develop a homeless policy paper analyzing the extent of homelessness in the community, the effectiveness of existing homeless programs and services, and recommended strategies for addressing the problem of homelessness.

145.    On June 17, 2014, the Eureka City Council voted to approve a resolution adopting the City of Eureka's 2014-2019 Housing Element as part of its City of Eureka General Plan Update.  Upon its adoption on June 17, 2014, the Housing Element became a "comprehensive statement of the City's housing policies and a specific guide for program actions to be taken in support of those policies."

146.    As Section 1-1 of the Housing Element explains, "Section 65302(c) of the California Government Code requires every city and county to adopt a Housing Element as a component of the General Plan.  State law requires the Housing Element to include 'identification and analysis of existing and projected housing needs and a statement of goals, policies, quantified objectives, and scheduled programs for the preservation, improvement, and development of housing.'  State law mandates the Housing Element 'shall identify adequate sites for housing, including rental housing, factory-built housing, and mobile homes, and shall make adequate provision for the existing and projected needs of all economic segments of the community.'"  The Housing Element explains further that "Housing Element law requires local jurisdictions to adequately plan to meet their existing and projected housing needs, including their fair share of the regional housing need."

147.    One of the goals of the Housing Element was to "[p]rovide adequate housing facilities and services for senior citizens, the homeless, and other special needs groups" by enacting policies that "assist extremely low-, very low-, and low-income households in renting or purchasing a home in Eureka," "promote the development of housing for special needs groups, including the homeless," and "coordinate with Humboldt County and other providers to pursue solutions to reduce homelessness that focus on expanding access to stable housing opportunities."  Programs identified for implementing this objective included (1) "encourag[ing] development during the planning period of approximately 20 housing units for extremely low-income households" earning 30 percent or less of the Median Family Income for the City of Eureka, with special emphasis on family housing, transitional housing and single-room occupancy units; (2) "providing opportunities for transitional housing, emergency shelters and SRO units to be accommodated within the City;" (3) "monitor[ing] the number of homeless individuals in the City and provid[ing] referrals to the appropriate organizations," such as area emergency shelters; (4) continuing to refer residents to the Humboldt County Housing Authority for Section 8 rental assistance; and (5) implement short-term, medium-term and long-term strategies for ending homelessness in Eureka, including targeted outreach and assessment of people in encampments, prioritizing high need/high barrier homeless people for available

housing, developing homeless outreach teams with a "Housing First" focus, and exploring the creation of a Mental Health Services Act ("MHSA") funded permanent supportive housing program for mentally ill homeless individuals.

148.    The City of Eureka's 2014-2019 Housing Element was approved without any reference to progress made towards achieving the City's regional housing need allocation ("RHNA") goals for the preceding 2009-2014 planning period.

149.    On September 5, 2014, Focus Strategies released its Homelessness Policy Paper commissioned by the City of Eureka.  Focus Strategies' September 2014 report noted that "[i]n keeping with federal policy priorities and national best practices, over the past several years the HHHC has been emphasizing the creation of housing as the key to ending homelessness, with funding shifting away from emergency and transitional services."  Focus Strategies agreed that "[a]ll available evidence shows that providing homeless people with housing, without making participation in other services a pre-condition, is the most effective way to reduce homelessness."

150.    In its 2014 report, Focus Strategies explicitly advised against the approach now being followed by the City of Eureka in its plan to evict all residents of the Palco Marsh encampment on May 2, warning that "[m]itigation and management approaches, such as clearing out encampments, creating legalized campgrounds, expanding emergency shelter capacity, or offering services not connected to housing might reduce some of the negative community impacts of homelessness, but do nothing to solve the underlying problem of people who do not have anywhere to live." "Focus Strategies strongly advises the City of Eureka not to pursue approaches directed at better managing the existing problems, such as by increasing the frequency of police sweeps or creating a legalized camping area or 'tent city.'  These approaches will not solve the underlying problem that people do not have a safe or healthy place to live, and there is little evidence that 'management' approaches do much to mitigate negative community impacts of homelessness."  Focus Strategies reiterated this strong advice in its follow-up January 2016 report to the Eureka City Council.

151.    Instead, the 2014 Focus Strategies report advised an "overall re-orientation of the City's efforts towards a 'Housing First' approach," and "recommend[ed] that the City focus its efforts on solutions that will actually end homelessness, rather than attempting to better manage the problem. Existing federal policy, evidence from many research studies, and best practices in the field all point to <u>housing</u> as the solution." Focus Strategies underscored this same advice in its January 2016 report to the Eureka City Council. Focus Strategies observed that HHHC's 2013 Update to the Humboldt County Ten Year Plan to End Homelessness "adopt[ed] many of the key objectives and approaches set forth in the federal HEARTH Act and the federal strategic plan to end homelessness, "Opening Doors." Federal policy prioritizes housing as the solution to homelessness and encourages communities to create programs that rapidly return homeless people to housing rather than having them spend lengthy periods of time in emergency shelter or transitional housing. Under the HEARTH legislation, communities are accountable for their results in meeting key performance measures: reducing the length of time people are homeless, reducing the rate at which people return to homelessness, reducing new entries into homelessness, and reducing the overall level of homelessness in a community. To accomplish these objectives, many communities are adopting a 'Housing First' approach in which homeless people are first assisted to secure a stable place to live before receiving services to address their other challenges (e.g., substance abuse treatment, mental health services, job training, etc.)."

152.    In its 2014 report, Focus Strategies identified and recommended to the City of Eureka a number of best practices for ending homelessness, including creating homeless outreach teams able to directly connect homeless persons with housing, setting the goal of housing a specific number of chronically homeless persons within a specific number of days, prioritizing high need/high barrier homeless people for available housing, and building "Rapid Re-Housing" programs. "Rapid Re-Housing" programs help the homeless "move quickly into permanent housing" by "offering targeted services and <u>time limited</u> financial assistance to make the move from homelessness to housing possible," and such programs "have demonstrated effectiveness in ending homelessness, shortening the time people spend being homeless, and reducing the rate at which people become homeless again." Focus Strategies also recommended

that the City explore "some modest additional capacity to provide shelter or short-term (90 to 120 days) transitional housing" for single homeless individuals.

153.   In December 2014, the City of Eureka requested that Focus Strategies submit a proposal for a Phase 1 scope of work to develop an implementation plan for the recommended strategies in its Sept 2014 Homeless Policy Paper.

154.   At the April 21, 2015 Eureka City Council meeting, Eureka Police Chief Andrew Mills reported that the City of Eureka was considering four potential locations for at least one temporary homeless campground, and that the homeless residents of the Palco Marsh encampment, who had been ordered to vacate the Marsh only a week before, would be given more time to leave while the city considered creating a new "homeless emergency shelter campground."  The City's consideration of four potential campground sites was described as part of a four-phase operation to address homelessness related issues, including crime, housing and access to services.

155.   Chief Mills said that the first phase of this plan, "Operation Safe Trails," was accomplished on April 15 when EPD officers swept through the Palco Marsh and made 30 arrests.  Phase two of the plan, called "Operation Helping Hands," would take place on April 30 and May 1, 2015, when local service providers including the Open Door Clinic, Eureka Rescue Mission, and DHHS would hold a services fair near the Palco Marsh encampment.  Phase three of the plan, "Operation Clean Sweep," was expected to last from June 1 through September 30, 2015.  In "Operation Clean Sweep," EPD officers planned to increase enforcement of the municipal "anti-camping" ordinance, sweep encampments to collect trash and debris, and remove the homeless residents of the Palco Marsh encampment to the planned temporary homeless campground.  EPD Captain Steve Watson told the City Council that Palco Marsh residents "don't have the option of not moving.  We've been patient for over a year."  The fourth and final phase, "Operation Final Stretch," envisioned converting the MAC to a "homeless triage center" with 100 beds, reorienting the City's efforts towards Rapid Re-Housing, and closing the temporary homeless campground.

156.   The first and second phases of this plan, as noted by the June 2015 Humboldt County Grand Jury report on Homelessness in Humboldt County, were actually accomplished by the City of Eureka.  The four-step plan consisting of Operation Safe Trails, Operation Helping Hands, Operation Clean Sweep, and Operation Final Stretch, as the Humboldt County Grand Jury disapprovingly noted, was developed by the City of Eureka, the Eureka Police Department, the Community Homeless Improvement Project ("CHIP"), DHHS, and members of the local business community; "[c]ontrary to one of the strongest recommendations of the Focus Strategies Report, the HHHC [Humboldt County's designated Continuum of Care agency for homeless individuals] was not involved or consulted in the plan's creation."

157.   At its regular May 19, 2015 meeting, the Eureka City Council voted to authorize Eureka City Manager Greg Sparks to send a letter to California State Assembly member Jim Wood in opposition to AB 718, a proposed piece of state legislation that would prohibit municipalities from restricting the right to sleep or rest in a parked vehicle.

158.   On June 24, 2015, Eureka City Manager Greg Sparks confirmed that the City was abandoning its plan to establish one or more temporary homeless campgrounds, and that homeless Palco Marsh residents would not be required to move in the near future.  Instead, Mr. Sparks said, the City would focus on implementing the Focus Strategies plan by continuing the MIST program jointly conducted by the EPD and DHHS, retooling the Multiple Assistance Center to focus on housing for single adults and couples, and conducting weekly cleanup and periodic law enforcement sweeps at the Palco Marsh encampment.

159.   On June 26, 2015, the Humboldt County Grand Jury issued a final report entitled "Homelessness in Humboldt County."  After "review[ing] the efforts being made by local government entities and service providers to assist the homeless in Humboldt County," the Grand Jury made four findings: (1) "[a]ll the current plans to deal with homelessness are flawed by the critical lack of affordable housing in Humboldt County;" (2) "[a] housing trust fund structured as a Joint Powers Authority will provide consistent funding for financing the construction, acquisition, and preservation of affordable housing that would mitigate the lack of affordable housing in Humboldt County;" (3) "Humboldt County lacks a countywide approach to

homelessness that provides a centralized intake service and a coordinated distribution of housing and supportive services;" and (4) the "Humboldt County Board of Supervisors and the Eureka City Council have not implemented a major recommendation of the Focus Strategies Report to coordinate their efforts on behalf of the homeless." The Grand Jury "call[ed] on the Humboldt County Board of Supervisors and the Eureka City Council to form a housing trust fund structured as a Joint Powers Authority ("JPA"), which includes the current Humboldt County Housing and Homeless Coalition to coordinate and administer Humboldt County's efforts to address and end homelessness."

160.    At its regular Sept. 1, 2015 meeting, the Eureka City Council took up a number of measures directed at the homeless population in the Palco Marsh, including a proposed municipal ordinance entitled "Storage of Personal Property in Public Areas" and a new "Eureka Open Space Property Management Plan."

161.    The Eureka City Attorney's report introducing the proposed "Storage of Personal Property in Public Areas" ordinance makes clear that it was aimed at preventing homeless people from storing their belongings on city property. The draft ordinance stated that the "unauthorized use of public areas for the storage of personal property interferes with the rights of other members of the public to use public areas for their intended purposes and can create a public health or safety hazard that adversely affects residential and commercial areas. The purpose of this ordinance is to maintain public areas and parks in a clean, sanitary and accessible condition, prevent the misappropriation of public areas and parks for personal use, and promote the public health and safety by ensuring the public areas and parks remain readily accessible."

162.    The City Attorney represented that adoption of the new "Storage of Personal Property in Public Areas" ordinance would only "codify the process the City already follows with regard to personal property stored on City property." The proposed ordinance authorized the City to confiscate and impound any "personal property" stored on city-owned property if not removed within 24 hours after written notice is provided, and authorized the city to confiscate "bulky items" – except for tents, anything too large to fit in a 60-gallon bin with the lid closed – and any item deemed an "immediate threat to the health or safety of the public" immediately and

without prior notice.  The proposed ordinance did not define what might constitute an "immediate threat" to "health or safety."  When items were confiscated, the ordinance would have required the city to leave a "conspicuously placed" notice disclosing what was taken and when, the location where the property could be retrieved, and a warning that property would be disposed of if not claimed within 90 days.  The proposed measure would also have barred the construction of tents in any public area between the hours of 6:00 am and 9:00 pm, and required that any tent constructed between 9:00 pm and 6:00 am in a public area be taken down by 6:00 am the following day.  Violations of the ordinance were to be subject to the provisions of EMC Section 10.99 and charged as an infraction or a misdemeanor at the City Attorney's discretion.

163.    The proposed "Open Space Property Management Plan" considered by the City Council on September 1 was also described by City officials as simply codifying existing practices.  The City Manager's report introducing the proposed plan noted that "[i]llegal camping on city owned waterfront property within the Coastal Zone has become an increasingly more difficult issue for city departments to resolve and control.  Despite recent cleanup efforts, sanitation issues, hazardous waster, and criminal activity within the area has become a major concern to the community at large, and has risen to a level of concern from regulatory agencies.  The City of Eureka has a responsibility to maintain public property in a safe manner.  The waterfront is a major economic driver within the community as a tourism asset for visitor services.  Future plans for trail development will continue with major investment of public funds."

164.    The new Open Space Property Management plan proposed to add to the City's comprehensive regulation of city-owned property "a framework for protection of waterfront open space, and the enforcement of current city ordinances."  The City Manager's report described a number of "planning challenges" to the development of the Eureka Waterfront Trail – all of them exclusively related to homeless encampments – and stated that although Eureka Municipal Code Section 93.02 prohibits camping and "camping is not allowed within the [Eureka Waterfront Trail] project area," the Palco Marsh "has been consistently utilized for both short and long term camping by transients and local un-housed residents for many years."  The

City Manager's report noted further that the "absence of potable water and restroom facilities in open space areas has resulted in people using the marsh and other parks, wooded and vegetated areas for sanitation purposes.  The practice of long term camping in the area between the foot of Del Norte Street, south to Bayshore Mall has resulted in the illegal dumping of sewage, and trash on public land.  This waste includes needles from illicit drug use, and other hazardous waste.  Human waste and dog waste is also prevalent.  This practice needs to be stopped to ensure a safe and healthy recreational environment for residents and visitors."   The City Manager also reported that "[c]amping, particularly long-term residential camping has become a significant issue for the City due to problems associated with this activity such as the building of semi-permanent structures, abandoned tents and tarps, sewage and trash dumping, hazardous waste, and fires.  As of 7/1/2015, the city has initiated a weekly clean up in zones within the marsh and has worked with law enforcement to create a more focused effort to improve conditions by removing criminals" from the area.

165.    The proposed Open Space Plan would have imposed new rules for the Palco Marsh encampment and the rest of the Eureka waterfront, including prohibiting wooden pallets, building materials, propane or gas stoves and charcoal grills in city-owned open spaces.  All of these items are commonly used in area homeless encampments.  The proposed Plan also provided that "[i]llegal camping will be enforced.  Violators will be provided notice of clean ups 72 hours in advance and are required to remove all physical belongings from the area to be cleaned of trash and debris by the City.  Failure to do so will result in citations and fines.  The City of Eureka will provide storage containers to assist in these efforts."

166.    At the September 1, 2015 Eureka City Council meeting, Eureka City Manager Greg Sparks, Eureka City Attorney Cyndy Day-Wilson and Eureka Parks & Recreation Director Miles Slattery provided reports to the Council on the proposed new municipal ordinance directed to Storage of Personal Property in Public Areas, and City Manager Sparks provided a report on the proposed Eureka Open Space Property Management Plan.  After hours of heated public comment on the proposals, the City Council voted to table both measures and take them up again in January, 2016.  After the proposals were tabled, one Council Member upset with the decision

told local reporters that "[i]t's almost like that part of the council didn't want to do anything until we have housing for everyone.  That's not going to happen."

167.    At the October 20, 2015 Eureka City Council meeting, the Council was presented with a slightly revised version of the tabled Open Space Property Management Plan, this time referred to as the Open Space Property Maintenance Plan.  The revised Open Space Property Maintenance Plan included a new section entitled "Eureka Open Space Implementation Plan," and stated that the "goal of this implementation plan is to provide for incremental enforcement of the illegal encampments within the City of Eureka open space along Humboldt Bay.  This effort is focused on reducing the size and number of encampments in both the short and long term." The implementation plan specified that the municipal anti-camping ordinance "will not be aggressively enforced, but will be addressed as necessary" along the waterfront north of the Bayshore Mall and south of Del Norte Street.  The proposed Plan would permit the city to begin immediately removing some building materials (including wood pallets, large tarps, etc.) being used for shelters and only later propose and pass an ordinance forbidding their use, as well as the use of cooking implements and "other materials and equipment."

168.    The revised Plan also added a new section titled "Eureka Homeless Policy," noting that the "total number of homeless people in Eureka is high compared to national standards, with homeless representing 2.7% of the population," and "a high proportion of people have serious mental illness and/or active substance abuse."  After recounting the "Housing First"-oriented recommendations made by Focus Strategies and approved by the City Council, the new Policy stated that the "City of Eureka administrative and legal staff recognizes that housing is the solution for ending homelessness, however management of criminal issues, garbage and sanitation in parks and public open space, and liability for maintaining a nuisance need to be continually addressed to meet the needs of the community.  In addition, solving homelessness is not a responsibility of the City of Eureka.  We do not have a dedicated funding source or staffing to create or implement a rapid re-housing program. . . . Staff recognizes that the implementation of rapid re-housing is a longer term solution to ending homelessness and that allowing unfettered illegal camping along the waterfront is detrimental to the community's

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

STACY COBINE *et al.* v. CITY OF EUREKA *et al.*

safety, leads to continued environmental degradation, and negatively impacts our tourism economy." The Homeless Policy also stated that "solving homelessness is not a responsibility of the City of Eureka."

169.    After hours of public debate at the October 20, 2015 meeting, the City Council approved the Open Space Property Maintenance Plan on a 3-1 vote with one member abstaining. During the meeting, Eureka City Manager Greg Sparks told the Council that the ultimate goal of the plan was to incrementally enforce the City's anti-camping ordinance in order to reduce the footprint of those illegally camping at the Palco Marsh, and reiterated that it is not the City's responsibility to solve homelessness, saying "I believe this is primarily a state and federal issue to resolve." City Manager Sparks also told the assembled crowd, to laughter from some in the audience, that "I don't think we view this as an eviction-type process." Eureka City Council Member Melinda Ciarabellini, in her comments on the measure, said of the Palco Marsh residents "[t]hey're not campers. They're trespassers. They're trespassing on our property."

170.    On November 17, 2015, the City of Eureka issued its response to the Humboldt County Grand Jury's report on Homelessness in Humboldt County, arguing that the City already had established an "effective relationship with Humboldt County to address homelessness, and stating that "[w]ith the elimination of Redevelopment Agencies in California in 2012, current funding levels have been extremely limit[ed] and other resources have been very competitive. The City of Eureka would not currently have an ongoing funding stream for a [housing] trust fund."

171.    At the January 5, 2016 meeting of the Eureka City Council, City Manager Greg Sparks presented a report and recommendation on the feasibility of a temporarily sanctioned homeless camp, and City Attorney Cyndy Day-Wilson presented a report and recommendation on a proposed Declaration of a Shelter Crisis. City staff recommended to the Council that it "not take action on declaring a 'Shelter Crisis' unless such an action is incorporated into and strategically aligned with the [Focus Strategies Implementation] Plan that will be presented to [the] Council on January 26." After hours of public comment, the City Council voted 3-2 to table the Resolution Declaring a Shelter Crisis until the next City Council meeting.

172.    At the January 19, 2016 meeting of the Eureka City Council, the Council heard a report from City Attorney Cyndy Day-Wilson regarding the Shelter Crisis Resolution tabled at the Council's last meeting.  The proposed resolution noted that "the California Legislature has enacted Government Code Setion 8698 et seq. . . which authorizes the City Council to declare that a shelter crisis exists within the jurisdiction of the City upon a finding that a significant number of persons within the City are without the ability to obtain shelter and a threat exists to the health and safety of those people."  The proposed resolution also stated that "the City of Eureka has received information that there is presently a significant number of persons within the City who are currently unsheltered," that "being unsheltered creates a threat to the health and safety of such persons," and that "such persons generally camp overnight in violation of the Eureka Municipal Code and the City's Open Space Maintenance Plan on or in City-owned property such as parks, greenbelts and marshes."

173.    The proposed Shelter Crisis Resolution stated further that the "City hereby finds and declares the existence of a shelter crisis in the City of Eureka pursuant to and in accordance with the provisions of California Government Code Section 8698.2(a)(1), because there is presently a significant number of persons in the City who are without shelter, resulting in a threat to their health and safety."  The proposed resolution specifically stated, however, that "this declaration does not specify any public facility owned, operated or leased by the City to provide emergency shelter for those persons who are without the ability to obtain shelter," and the "City Council encourages groups within the community to provide emergency shelter for those persons who are without the ability to obtain shelter."  After extensive public comment, the City Council voted 3-2 to adopt Resolution No. 2016-06 Declaring the Existence of a Shelter Crisis.

174.    In January 2016, Focus Strategies released its Homeless Strategy and Implementation Plan: Phase 1, commissioned by the City of Eureka and Humboldt County. Focus Strategies opened its Overview of Recommendations by stating that "[f]ederal policy, evidence and research from the field, and local data all point to **housing** as the solution to homelessness."  In order to achieve that goal, Focus Strategies recommended a number of "key strategies" to reduce homelessness in Eureka, including adopting a "Housing First" approach to

solving homelessness "in which each homeless person received assistance to secure permanent housing as quickly as possible, without preconditions that they participate in supportive services, substance abuse or mental health treatment."  In particular, Focus Strategies recommended that the City of Eureka "formally adopt a policy statement or resolution endorsing a Housing First approach."  Focus Strategies also recommended that the City re-orient its MIST program to focus on providing housing solutions to unsheltered homeless people in Eureka by "directly offer[ing] housing assistance."  Focus Strategies recommended further that the City "create direct and low-barrier pathways to housing," stating that the "key to making progress on reducing homelessness in Eureka . . . will be to begin re-structuring and re-aligning existing efforts, including funding strategies, to make available a greater array of housing options for people who are unsheltered," including emergency shelter and transitional housing, rapid re-housing consisting of assistance locating a rental-unit and short-term rental payment assistance, and permanent supportive housing in which "clients receive long-term rental subsidies or permanent affordable units, coupled with extensive on-site support services."

175.    Focus Strategies' January 2016 report also noted the findings and recommendations of the United States Interagency Council on Homelessness ("USICH")'s August, 2015 policy paper entitled "*Ending Homelessness for People Living in Encampments: Advancing the Dialogue*."  Focus Strategies noted that the recommendations of the August 2015 USICH report were "strongly aligned with the approach recommended in the Focus Strategies Policy Paper and with this implementation plan."  Focus Strategies reported that the approach recommended by USICH to dealing with the problem of homeless encampments "is to identify housing solutions for people living in encampments.  Other options, such as the forced removal of encampments or making them "authorized" through the creation of tent cities, do little to solve the problem."  In particular, Focus Strategies emphasized USICH's warning that the "forced dispersal of people from encampment settings is not an appropriate solution or strategy, accomplishes nothing toward the goal of linking people to permanent housing opportunities, and can make it more difficult to provide lasting solutions to people who have been sleeping and living in the encampment."  Focus Strategies cited USICH's recommendation that "provision of

low-barrier pathways to permanent housing" and "preparation and adequate time for planning and implementation" should both be components of policies designed to address homeless encampments.

176.    In its January 2016 report, Focus Strategies reiterated that "[t]o be successful in reducing the number of chronically homeless encampment residents, Eureka . . . will need to employ a 'housing first' approach offering homeless people the chance to move directly into permanent housing and which incorporates a 'harm reduction' philosophy, in which clients are not required to become clean and sober or agree to receive mental health services as a condition of receiving housing." Focus Strategies noted that "[w]hile currently there appears to be some level of understanding of the Housing First approach within the Eureka . . . community, . . . it is not yet embraced as an organizing philosophy throughout the system. Based on our conversations with City and County staff, providers, and other stakeholders, it appears that the community is still very much operating from a belief that homeless people have to become 'housing-ready' before they can exit homelessness. Many housing programs and providers in Humboldt County and Eureka continue to impose significant barriers to admission, including requirements relating to sobriety, willingness to participate in services, and other conditions that have the effect of screening out those people who have been homeless the longest and have the greatest need for housing and services."

177.    Focus Strategies recommended that the City Council adopt a policy statement affirming its commitment to the Housing First approach and their expectations from community partners accordingly, reiterating that "a primary finding of our analysis is that, for Eureka's homeless population in particular, full and complete adoption of Housing First principles and strategies are essential to successfully reducing the homeless population." With respect to the goal of re-orienting MIST to focus on housing solutions, Focus Strategies stated that "[t]o be more effective, this team needs to become more housing focused and have the ability to directly offer housing interventions. . ." As to the goal of creating direct and low-barrier pathways to housing, Focus Strategies stated that the "key to making greater progress on reducing homelessness in Eureka and throughout Humboldt County will be to begin re-structuring and re-

aligning existing efforts, including funding strategies, to make available a greater array of housing options for people who are unsheltered," and that it would be "essential to view this undertaking with a Housing First lens, developing a range of housing opportunities that homeless people can access directly, not requiring long stays in transitional settings, and not imposing unnecessary barriers to permanent housing access."

178.    Focus Strategies advised further that "making rapid re-housing available to all homeless households will be the key to achieving a significant reduction in homelessness in Eureka," and that since "[c]urrent resources in the community to fund this approach are limited," "bringing rapid re-housing to scale will require a major effort to re-align and re-program existing funds, as well as seeking out new funding sources (both public and private) for both the rental assistance and the supportive services components."  Steps suggested by Focus Strategies to better prioritize access to permanent supportive housing included transitioning people currently living in permanent supportive housing units into Section 8 housing to free up permanent supportive housing units for others, and "expanding the supply of permanent supportive housing either through creation of new tenant-based vouchers or dedicated deed-restricted units. Measure A restricts the amount of publicly funded affordable housing that can be developed in Eureka, which will make it all the more important to pursue opportunities to expand the supply of tenant-based rent subsidies (or explore a ballot measure to modify Measure A)."  Focus Strategies also recommended that the City consider giving homeless people priority for Section 8 vouchers and acquiring and rehabilitating existing motels and other rental properties for conversion to affordable housing.

179.    Focus Strategies also recommended that to more effectively provide transitional housing services, the MAC should focus more on "prioritizing beds for homeless people with the highest housing barriers," "review entry requirements to remove barriers for admission" and "unnecessary service participation requirements," "orient services around housing," and "have direct access to rapid re-housing resources, either by funding MAC to provide rapid re-housing or co-locating a rapid re-housing provider on-site."  Focus Strategies noted that "to effectively serve high-need, high-barrier chronically homeless people, program rules [at the MAC] should

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

STACY COBINE *et al.* v. CITY OF EUREKA *et al.*

be re-oriented to ensuring that the facility is safe and secure, and participants only asked to leave if they are violating these rules and creating a danger to themselves or other participants. Terminating participants for 'failure to accept services' is not aligned with a Housing First approach and will result in people being discharged right back to homelessness."

180.    Focus Strategies recommended that as an initial step towards expanding housing, the City of Eureka should undertake the "achievable goal of housing 30 people in 60 days," and then "build[ing] over a period of two years to encompass the majority of the homeless people in the community."  The City of Eureka has not yet launched such a 30/60 campaign.

181.    On January 26, 2016, the Eureka City Council held a joint meeting with the Humboldt County Board of Supervisors to discuss Focus Strategies' Homeless Strategy and Implementation Plan: Phase 1 report and hear a presentation on the plan from Focus Strategies consultants.  After extensive public comment following the Focus Strategies presentation, the City Council voted unanimously to receive the Focus Strategies report and schedule it for further discussion at the regular February 2, 2016 Eureka City Council meeting.

182.    At the February 2, 2016 Eureka City Council meeting, the City Council unanimously voted to adopt the Homeless Strategy and Implementation Plan: Phase 1 presented by Focus Strategies, to appropriate $250,000 from the Housing Successor Fund towards ending homelessness, and to direct the City Manager to prepare a joint Resolution for consideration by the City of Eureka and the Humboldt County Board of Supervisors addressing Housing First and community-wide collaboration to end homelessness.  On February 16, 2016, the Eureka City Council adopted a resolution in support of a Housing First approach to solving homelessness.

183.    On March 18, 2016, the Eureka City Council established a deadline of May 2, 2016 to remove all encampments in violation of Eureka Municipal Code Section 93.02 from the Palco Marsh and all other locations in Eureka.  In a Request for Proposal later issued to solicit bids for providing shelter options for displaced Marsh residents, the City explained this decision was made because it had "determined that the elimination of camping in the vicinity of the Waterfront Trail construction was necessary due to public safety, environmental concerns and for the health and welfare of those camping illegally in the area."  The same Request for

Proposal noted that "[c]urrently, approximately 180 individuals live within the confines of the waterfront open space – roughly from behind Bayshore Mall to within 150 yards of the south side of the foot of Del Norte Street. Other homeless individuals live in more scattered sites on typically public property near the Samoa Bridge, and on property adjacent to the City."

184.    On March 22, 2016, EPD officers distributed flyers entitled "Notice to Vacate" to residents of the Palco Marsh encampment. The Notice to Vacate stated that "[i]t is a violation of law to camp on public or private property within the City of Eureka. It is also a violation of law to encroach or obstruct any public right of way." The Notice to Vacate continued that "[a]ll personal property must be removed. Any property remaining after **May 2, 2016** will be removed by the City of Eureka. Any property that is deemed to be a health and safety hazard shall be removed **immediately and discarded**. Any property that is deemed abandoned will be **immediately discarded**. This notice applies to all personal property that is deemed to have been relocated to another area within the City of Eureka or public right of way in response to this notice."

185.    The Notice to Vacate advised Palco Marsh residents that "[a]ny property that is removed may be reclaimed by calling (707) 441-4060 and scheduling a date and time for pick-up or at the large Conex box located in the north parking lot of the Bayshore Mall. Any property that is not reclaimed within ninety (90) days of removal will be disposed of." The Notice concluded with the warning that "[a]ny person(s) failing to comply with this Notice to Vacate will be in violation of state law including the California Penal Code, California Streets and Highways Code and the Eureka Municipal Code and **will be prosecuted**." Plaintiffs are informed and believe that the City also intends to confiscate unlicensed and unvaccinated animals from Palco Marsh residents on May 2, plans to have them taken for shots and to be spayed or neutered, and will require that Marsh residents pay the veterinary fees within ten days after their impoundment in order to reclaim their pets, or else the animals will be euthanized.

186.    On March 25, 2016, the City of Eureka issued a Request for Proposal for Homeless Services ("RFP"), with a deadline of April 22, 2016 for submitting proposals. The RFP stated that the "large majority of the City's homeless population is currently concentrated in

a sensitive habitat area that is slated for trail construction in the summer of 2016. The planned construction activities include the demolition of large remnant buildings and will therefore necessitate that the existing homeless population be evacuated from the construction site. This creates a serious challenge for the City to implement the rapid rehousing plan. The City does not want to deviate from the Housing First approach, but the City also recognizes the fact the homeless population in the sensitive habitat areas slated for construction must vacate the area." The RFP further explained that "[t]emporary homeless camps and shelters are not part of the City's strategic plan for reducing homelessness; however the City recognizes that rapid re-housing and permanent supportive housing will not meet all housing needs in the immediate short term."

187.    The RFP requested proposals from private organizations to "develop and implement a strategy for the relocation of the homeless population" in the Palco Marsh "to another site for a maximum period of six (6) months." The RFP required that such proposals contain a detailed project description, including identification of a site and site ownership, staffing plan, and a security and safety plan, along with a detailed budget including funding sources and expenses that "shall not include City matching funds or any funding provided by the City." The RFP also required that proposals provide proof of liability insurance up to $5M per occurrence, proof of ability to indemnify the City, and execution of a hold harmless release in the City's favor. The RFP stated that after considering all proposals submitted by April 22, the City would approve a selected proposal (if any) on May 3, 2016 – the day *after* evacuation of the Palco Marsh encampment.

188.    In late March or early April, 2016, the City of Eureka posted a recorded Public Service Announcement on its website home page. The voice recording states that the "City of Eureka will begin work on Phase A of the Waterfront Trail beginning in mid-May. All illegal campers at the Palco Marsh will need to be out by May 2nd. . . . Remember, all camping in the City of Eureka is illegal."

189.    At the April 5, 2016 meeting of the Eureka City Council, after an hour-and-a-half of public comment and debate, the Council voted 3-2 to modify the existing Shelter Crisis

Declaration to allow homeless people displaced from the Palco Marsh and other homeless residents of Eureka to sleep in a city-owned parking lot at the corner of Washington and Koster Streets for a temporary sixty (60) day period, beginning April 11 and ending June 10, 2016.  The City Council also voted to work with St. Vincent de Paul to allow up to 35 cots to be set up in its dining facility to provide temporary shelter for up homeless single men for a period of 6 months. At the City Council meeting, City Manager Greg Sparks admitted that "[w]e certainly recognize that neither one of these strategies are part of the City's Housing First strategy."

190.   On April 14, 2016, the Humboldt County Human Rights Commission, a volunteer-based county commission empaneled to issue recommendations to the County, delivered a letter to the Humboldt County Board of Supervisors and the City of Eureka stating that the "situation concerning the planned displacement of homeless people in Eureka is a human rights issue," and urging the Board to "[d]eclare an emergency Shelter Crisis," "[c]ollaborate with the City of Eureka to resolve this crisis," "[s]top the expulsion of people from the Palco Marsh, which puts them and others into a more dangerous and disruptive situation," "[d]esignate areas in the county for homeless/houseless people to live in a legal, safe and healthy place until such time as the Homeless Strategy and Implementation Plan is fully implemented and permanent housing is available," and "[e]ncourage the City [of Eureka] to designate long-term legal, safe living spaces to be available for homeless/houseless people until such time as the Homeless Strategy and Implementation Plan is fully implemented and permanent housing is available."

191.   The Human Rights Commission noted that "[t]hose living in the Marsh are experiencing an inability to obtain shelter and their health and safety is threatened.  The majority of them have disabilities.  Many have dual disabilities."  Accompanying the Commission's letter was a support document noting that "[s]ince mid-2014, the city of Eureka has passed eight or [nine] ordinances or policies/plans that further criminalize the homeless.  They have ramped up law enforcement and social services to address the situation created by not enforcing the camping law within the City of Eureka and directing homeless individuals and families to go to the Marsh as the camping laws were not being enforced there, and if found elsewhere they would

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

STACY COBINE *et al.* v. CITY OF EUREKA *et al.*

be arrested.  The growth in the population of the residents at the Marsh increased substantially over the past two years .  Residents were told by the [Eureka] Police Chief that they would not be made to leave until there was an alternate place for them to go. . . ."  The Commission noted further that "since last October the Police and the city have been implementing the Open Space Property Maintenance Plan passed by the City Council in October of 2015.  The strategy of incremental enforcement is designed to continually fold the camp in on itself from the exterior until the living conditions become so untenable there it is not habitable, disbursing the population by design."  The Commission noted that "housing is not available now, nor will it be anytime soon, in sufficient quantity to meet the needs of those being forced out of the Marsh."

**Current Palco Marsh Residents Who Will Be Displaced by the Eviction**

192.     Present estimates by the EPD, local advocacy groups and service providers, and local news media suggest that approximately 140 homeless individuals are still residing at the Palco Marsh.  As many as 50 or more residents have already disbursed from the encampment in the wake of the City's Notice to Vacate.

193.     Many of the people remaining at the Palco Marsh encampment who will be evicted by the City of Eureka on May 2 have moderate to severe physical and mental disabilities, including bipolar disorder, paranoia, chronic alcoholism and/or substance abuse issues, diabetes and complications thereof, anxiety disorders, and post-traumatic stress disorder.  As the Humboldt County Human Rights Commission noted this month, "[t]hose living in the Marsh are experiencing an inability to obtain shelter and their health and safety is threatened.  The majority of them have disabilities.  Many have dual disabilities."  The City of Eureka's "Eureka Homeless Policy," part of its Open Space Property Maintenance Plan, acknowledges that "a high proportion of [homeless] people [in Eureka] have serious mental illness and/or active substance abuse."   Of the 1,319 homeless persons surveyed by the HHHC's 2015 Point-in-Time Count, 632 of them (47.9%) reported having a disabling condition, 493 (37.4%) reported being a victim of domestic violence, 439 (33.3%) reported having a substance abuse disorder, 405 (30.7%) reported having a serious mental illness, and 22 (1.67%) reported having HIV/AIDS.

194.     Many of the Palco Marsh residents who will be expelled from their homes on

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

STACY COBINE *et al.* v. CITY OF EUREKA *et al.*

May 2 are medically vulnerable as a result of poor nutrition in combination with their other conditions.  Many cannot work as a result of their disabilities.  Others have difficulty finding work and survive on government assistance, food stamps, recycling, and/or doing odd jobs. Focus Strategies noted in its September 2014 report to the Eureka City Council that "[l]ittle data is available on the characteristics of the unsheltered homeless population in Eureka, but based on our site visit to the [Palco Marsh] encampment as well as discussions with staff from the Mobile Intervention and Services Team (MIST), it appears that there is a very high proportion of people with serious mental illness and/or active substance use, as well as a significant number of people with criminal records.  This is a population that is very challenging to engage in services and also difficult to house."  Focus Strategies called the needs of this population "unusually complex," and predicted that a combination of housing and intensive services will be needed for a higher portion of the unsheltered population than is typical."

195.    According to the definition provided by the United States Department of Housing and Urban Development ("HUD"), the overwhelming majority of people living at the Palco Marsh encampment are "chronically homeless."  HUD currently defines "chronically homeless" individuals as homeless people with a disabilities who live either in a place not meant for human habitation, a safe haven, an emergency shelter, or an institutional care facility (if the individual has been living in the facility for fewer than 90 days and had been living in a place not meant for human habitation, a safe haven, or an emergency shelter immediately before entering the institutional care facility).  In order to be considered "chronically homeless," an individual also must have been living as previously described continuously for at least 12 months, or on at least four separate occasions in the last 3 years, where the combined occasions total a length of time of at least 12 months, and where each period separating the occasions includes at least 7 nights of living in a situation other than a place not meant for human habitation, a safe haven, or an emergency shelter.  *See* 24 C.F.R. § 91.5; 24 C.F.R. § 578.103; 24 C.F.R. § 578.103.  Focus Strategies explained in its September 2014 report that the "chronically homeless" are "those who have been homeless for the longest periods of time and have the greatest barriers to securing housing."

196.   Focus Strategies, the consulting group engaged by the City of Eureka to study its homelessness problem, found "very significant numbers of unsheltered chronically homeless people in Eureka." The DHHS Mental Health Services Act Three-Year Plan for Fiscal Years 2014/2015, 2015/2016, and 2016/2017 also indicates that "Humboldt County has been designated as a community of high need by HUD due to the large number of people who are Chronically Homeless (CH) relative to size of population." The HHHC's 2015 Point-in-Time Count reported that 878 respondents (68.9%) had been continuously homeless for a year or more. In its April 14, 2016 letter to the Humboldt County Board of Supervisors and the City of Eureka, the Humboldt County Human Rights Commission also reported that "[m]ost of the Palco Marsh residents remaining in this location are chronically homeless" and "have the least capability to get out of homelessness due to a variety of reasons."

**Effect of Planned Eviction on Current Palco Marsh Residents**

197.   The effect of the planned May 2 eviction of all homeless persons from the Palco Marsh encampment will be devastating. The structures and tents that they call home will be seized and likely destroyed. Residents' personal items still remaining at the encampment on May 2 will be confiscated by the City, unless the EPD deems those items abandoned or a health or safety hazard, in which case they will be summarily and immediately thrown away. The EPD exercises unilateral discretion over what constitutes an "abandoned" item or a "health or safety hazard." Historically, the EPD has treated personal items belonging to Palco Marsh residents as abandoned and discarded them as trash simply because a campsite happens to be momentarily unattended by its occupant.

198.   The EPD has informed Palco Marsh residents that "[a]ny property that is removed [during the Palco Marsh eviction] may be reclaimed by calling (707) 441-4060 and scheduling a date and time for pick-up or at the large Conex box located in the north parking lot of the Bayshore Mall. Any property that is not reclaimed within ninety (90) days of removal will be disposed of." At the time of pickup, Palco Marsh residents attempting to retrieve property confiscated during the eviction are likely to have to sort through an entire metal shipping container of impounded belongings to locate the items belonging to them. That task, as a

practical matter, may ultimately be impossible.  The EPD has also informed Palco Marsh residents that during the May 2 eviction, all unvaccinated, unfixed and unlicensed animals will be impounded and taken to a veterinarian for shots and alteration, and that their owners will have to pay the associated veterinary bills incurred within ten (10) days in order to reclaim their pets. If payment has not been made in full within ten (10) days, the beloved pets and service animals of the evicted Palco Marsh residents will be euthanized.

199.    Even if their possessions are not thrown away as trash in the course of the eviction and are successfully retrieved by the City, they will likely be lost as a result of the City's actions regardless, because those evicted from the Palco Marsh will not have any place to store those belongings.  For many, the Palco Marsh encampment represented the only community they have ever known.  It is where they have felt supported, accepted, and safe.  Because the City of Eureka has inadequate emergency shelter and alternative housing resources for the homeless and little affordable or subsidized housing, and the City has not allowed Palco Marsh residents sufficient time to secure all but emergency shelter before the May 2 eviction date (provided any is available), many current Palco Marsh residents will have no choice, if they are evicted, to return to the streets and to a life lived with the constant threat of criminalization.

200.    The effect of criminalization on homeless people is severe.  The penalty for an infraction is a fine.  If they miss a court date, a civil assessment of $300 will be added onto their fine.  For homeless people who cannot afford to pay, these fines quickly turn into arrest warrants. Armed with a warrant, the police can arrest a homeless person at any time.  The constant threat of arrest is particularly detrimental to homeless people who are ill or suffer from physical or mental disabilities.  Additionally, active warrants can impair the ability of a homeless person to obtain housing, employment, and other benefits.  A warrant for failure to appear can result in the termination of Social Security benefits.  Homeless individuals must disclose criminal convictions on applications for public housing.  These convictions become a matter of public record.  As a result, these convictions can cause a person who is homeless to lose the opportunity to obtain public and/or private housing.  In addition, an individual may lose a housing placement if he or she is incarcerated.  Conviction and incarceration can also interfere with their ability to obtain

and maintain Social Security disability benefits.  Recipients may not receive benefits for any period in which they are incarcerated.

201.    If current Palco Marsh residents, including Plaintiffs, are forced to leave their homes and live on the street in unfamiliar areas, and without the support of the community, they will be vulnerable to assault, theft, harassment, and worse.  In September, 2015, for instance, a homeless senior citizen was beaten to death on the sidewalk outside the Courthouse Market in Eureka – directly across the street from the Humboldt County Superior Court, the Humboldt County Jail, and the Humboldt County Sheriff's Office.  Women, in particular, will be at risk of victimization and physical violence if evicted from their homes at the Palco Marsh and forced to live on the street.  If people are forced to leave the living spaces they have created for themselves at the Palco Marsh encampment, they are likely to find themselves with no alternative but to live on the street, which can result in or exacerbate a variety of physical and mental impairments. Living on the street causes health problems related to exposure and neglect.  The fact that many people living at the Palco Marsh suffer from a variety of mental and physical disabilities increases the likelihood that they will have great difficulty coping with the consequences of eviction from a stable community.

202.    In short, evicting people currently living at the Palco Marsh, without providing a safe, affordable, appropriate long-term alternative place for them to live poses a serious risk to their health and well-being.  Successfully transitioning Palco Marsh residents to another location, without causing harmful consequences, requires a sustained effort and enough resources and time to find solutions that reasonably accommodate each resident's physical, emotional, and mental health needs.

**Planning and Federal Funding of the Eureka Waterfront Trail Project**

203.    Planning for the Eureka Waterfront Trail began in 2005.  In September, 2005, the Eureka Trails Committee's Eureka Waterfront Trail and Promenade Recommendations were adopted by the City Council.  When completed, the Eureka Waterfront Trail will extend 6.3 miles in length and become part of the California Coastal Trail.  The southernmost 1.5 miles of the Eureka Waterfront Trail (the Hikshari' Trail) was constructed in 2012.  Three phases of the

trail remain to be built.  The next phase of the Eureka Waterfront Trail is designed to run through the Palco Marsh.

204.    In its Waterfront Trail project permit application to the Humboldt Bay Harbor, Recreation and Conservation District, the City of Eureka stated that the project was intended to "reclaim areas frequented by transients and the local homeless population."  The City's Waterfront Trail project permit from the Harbor Commission requires that all work authorized under the permit shall be subject to approval from the U.S. Army Corps of Engineers, the California Coastal Commission, and the North Coast Regional Water Quality Control Board. The Harbor District project permit for the Waterfront Trail does not expire until February 25, 2017, and may be extended in annual increments for up to nine years upon the City's request and the District's discretionary approval.

205.    The City of Eureka has not yet obtained its permit from the Coastal Commission to construct Phase A of the Waterfront Trail through the Palco Marsh, and the Coastal Commission will not take up the matter before its regularly scheduled May 11-13, 2016 meeting. This means the process for awarding the contract for the project will be delayed, and the start date on construction of the trail will also likely be delayed until at least mid-June, whether or not homeless residents of the Palco Marsh are expelled on May 2, 2016.  On information and belief, there is currently no construction schedule for Phase A of the Eureka Waterfront Trail and no contract for its construction.

206.    Concrete remnants to be removed from the Parcel 4 property prior to construction of the Waterfront Trail are located to the south of the Bayshore Mall property, while the existing Palco Marsh encampment is to the north of the Bayshore Mall property.   The Harbor District permit proposal specified that "[a]ccess points for construction equipment will be located near the Chevron gas terminal, the north eastern most corner of the Bayshore Mall parking lot and the foot of Vigo Street."  The City only issued its request for bids on the concrete demolition project on April 10, 2016.

207.    The Eureka Waterfront Trail project, including Phase A through the Palco Marsh, is a Eureka Non-Freeway Alternative Funding project funded with a mix of state and federal

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

STACY COBINE *et al.* v. CITY OF EUREKA *et al.*

funds.  Funding for this project includes funds originally obtained to build an interstate freeway through Eureka.  After the decision was made not to build the freeway after all, the right-of-way was sold and the Eureka Non-Freeway Alternative Project Fund ("ENFA") was created.  In June, 2000, the California Transportation Commission ("CTC") programmed the first project from the ENFA fund for improvements on Highway 101 in Eureka at 4th, 5th and V Streets.  In April 2005, the CTC approved a technical correction to "modify the state/federal split" on three funding allocations for the 4th, 5th and V Streets project.

208.    In October, 2001, the CTC programmed the remaining ENFA funds to the Eureka Waterfront Drive Extension project.  At its November 8, 2001 meeting, the CTC allocated "state and federal funds of $250,000 for one (1) Eureka Non-Freeway Alternative project," identified in the accompanying CTC Financial Vote List as the Eureka Waterfront Drive Extension project. California Department of Transportation Resolution FP-01-33: Allocations for Eureka Non-Freeway Alternative Project, presented at the November, 2001 CTC meeting, states that the $250,000 allocated to the Waterfront Drive Extension project is comprised of $29,000 in state funding and $221,000 of federal funding.

209.    The Waterfront Drive Extension project was revised in October 2013 to eliminate the extension of the roadway and sidewalk, but still construct the multi-use trail along Eureka's Waterfront.  The project was renamed Waterfront Trail Phase A, total project funding reduced to $2,390,000, and $1,200,00 of that amount reprogrammed "to fully fund the construction phase." The remaining ENFA funds were programmed to another project.

210.    In January, 2015, the CTC accepted the Mitigated Negative Declaration for the Eureka Waterfront Trail project, Phase A, and approved the project for future consideration of funding.  The Agenda Memorandum indicates the "project is estimated to cost $2,390,000 and is fully funded through construction with Eureka Non-Freeway Project Alternative Funds."  At its January 2015 meeting, the CTC also allocated $190,000 for Phase A of the Waterfront Trail Project.  The Vote List attached to the CTC Memoranda for this allocation indicated the funds were to be used to "complete the design component" and that the City requested the allocation

"come from this project's remaining programmed Eureka Non-Freeway Alternative Project Funds."

211.    In March 2016, the CTC allocated $1,200,000 "for the locally administered Eureka Non-Freeway Alternative Fund project in Humboldt County as described on the attached vote list."  The accompanying Vote List indicates that the allocation was to "construct approximately 6,150 lineal feet of Class I multi-use trail.  (Funded from Eureka Non-Freeway Alternative Project Funds)."  It also stated that this "allocation for [construction] to come from the Eureka Non-Freeway Alternative Project Funds (State Only)."

212.    The California Transportation Improvement Plan System ("CTIPS"), a publically-accessible CalTrans computer database, indicates the "fund type" of the January 22, 2015 allocation of $190,000 for the Eureka Waterfront Trail Project comes from the "National Hwy System," and the March 2016 allocation was funded by "State Cash."  However, the three "state cash" items noted in the CTIPS database from 2001, 2005 and 2008 are from when the Waterfront Trail project was known as the Waterfront Drive Extension Project, and as noted above, the October 2001 allocation to this ENFA project included "state and federal funds."

213.    The CTIPS database also lists activity and other database changes associated with the Eureka Waterfront Trail project, and those notes contain entries confirming funding for the project was derived from a mix of state and federal funds.  The most recent entry, dated March 10, 2016, states that "CTC approved an allocation of $1,200k ENFAP [Eureka Non-Freeway]."  A CTIPS database entry dated January 13, 2015 states that "CTC approved Future consideration of funding and allocation of $190K PS&E FY 14/15 of the Eureka Non-Freeway Funds."  A CTIPS database entry dated March 24, 2014 states "STIP[2] funding removed, fully funded from ENFA funds."  A June 15, 2010 CTIPS database notation states that "Project include 'Other State' funds which are Eureka Non-Fwy funds that get allocated by the CTC."  A CTIPS database notation dated December 19, 2001 states that "[d]ue to the limitations of CTIPS, the allocation for the Eureka Non-Freeway Alternative Project Funds has a special procedure

---

[2] "STIP" is the State Transportation Improvement Program, a state funding source.

because the funds aren't STIP."  Another CTIPS database notation dated November 15, 2001 states that "'Other State Funds' in CTIPS is the Eureka Non-Freeway Alternative Funds for this project.  Proj is noted at State Case in CTIPS due to the limitations of the data base.  Proj is actually State/Fed."

## FIRST CLAIM FOR RELIEF

### Violation of Prohibition Against Cruel and Unusual Punishment

### (Eighth Amendment; 42 U.S.C. § 1983)

214.    Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

215.    Defendants have announced their intent to begin enforcing Eureka's municipal "anti-camping" ordinance at the Palco Marsh encampment on May 2, 2016.  The emergency shelter, transitional housing, permanent supportive housing, and/or affordable or subsidized housing resources available to homeless persons in Eureka on May 2, 2016 will be wholly inadequate to accommodate all the displaced residents of the Palco Marsh encampment.  Despite the impossibility of sheltering all the homeless residents of the Palco Marsh by May 2 given the existing lack of adequate City, County and private resources to assist Eureka's unusually large homeless population, the City of Eureka still intends to enforce municipal ordinances essentially making it impossible for a homeless person to live in Eureka and perform the functions necessary for his or her survival without breaking the law.   That will be the situation immediately for Palco Marsh residents who are unable to secure one of the few available emergency shelter beds, or who have a disability that makes it impossible for them to stay in an emergency shelter in the first place.

216.    Eureka Municipal Code Section 93.02 prohibits life-sustaining activities that people who are homeless must engage in, such as lying down at night, seeking shelter from the elements, using bedding to keep warm, or simply remaining in one place for a length of time.  Under Defendants' plan for the eviction of the Palco Marsh encampment, Plaintiffs and other homeless residents of the Palco Marsh will be subject to arrest and punishment for violating Section 93.02 or other related laws forbidding camping on private or public property.   The

actions for which they will be punished are involuntary and necessary for survival – going to sleep at night, covering oneself from the cold, seeking shelter from the rain – and essentially criminalize the status of being homeless in Eureka.  Punishment for involuntary acts arising out of the status of homelessness constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution, as incorporated in and applied to the states through the Fourteenth Amendment.  Plaintiffs seek redress for Defendants' violation of their right to be free from cruel and unusual punishment.

### SECOND CLAIM FOR RELIEF

### Violation of Uniform Relocation Assistance Act

### (42 U.S.C. §§ 4601 *et seq.*)

217.    Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

218.    The federal legislature's intention to protect persons who are displaced from their residences by actions of the federal government, particularly low-income persons, is reflected in the Uniform Relocation Assistance Act ("URA").  42 U.S.C. § 4601 *et. seq*.  The URA ensures that displaced persons, as defined in the Act, shall receive a variety of types of assistance, as set forth below.  The primary purpose of the URA is to ensure that displaced persons "shall not suffer disproportionate injuries as a result of programs and projects designed for the benefit of the public as a whole and to minimize the hardship of displacement on such persons."  42 U.S.C. § 4621(b); 24 CFR § 290.17(b).  In fact, the URA declares that minimizing the hardship associated with displacement is "essential to maintaining the economic and social well-being of communities."  42 U.S.C. § 4621(a)(4).

219.    Among the URA's explicit statements of intent is a policy to improve housing conditions of economically disadvantaged persons "to the maximum extent feasible."  42 U.S.C. § 4621(c)(3).  While "displaced persons" within the meaning of the URA do not include those who have been determined to be in unlawful occupancy of the displacement dwelling (*see* 42 U.S.C. § 4601(6)(B)(i)), in this case, Plaintiffs and other residents of the Palco Marsh encampment were specifically sent to camp in that location by EPD officers and/or the City of

Eureka.  The City of Eureka's longstanding awareness of the Palco Marsh encampment, its decision not to enforce the City's municipal anti-camping ordinance at the Palco Marsh encampment for more than a decade, and its affirmative decision to instruct homeless people found camping in other areas of Eureka to relocate to the Palco Marsh all establish that Plaintiffs and the other homeless residents of the Palco Marsh are occupying their residences at that location lawfully.

220.   The URA requires the displacing agency to determine and make timely recommendations on the needs and preferences of displaced persons for relocation assistance.  42 U.S.C. § 4621(c)(3).  A "displacing agency," for purposes of the URA, "means any Federal agency carrying out a program or project, and any State, State agency, or person carrying out a program or project with Federal financial assistance, which causes a person to be a displaced person."  42 U.S.C. § 4601(11).  In relevant part, the URA defines a "State agency" as "any department, agency, or instrumentality of a State or of a political subdivision of a State."  42 U.S.C. § 4601(3).  Here, the Eureka Waterfront Trail is being built with a mix of state and federal funds, bringing the project within the ambit of the URA.  The City of Eureka claims Palco Marsh residents are being evicted from their encampment on May 2 in order to permit construction of the Eureka Waterfront Trail to continue.

221.   The URA also provides that the displacing agency – in this case, the City of Eureka – shall provide comparable replacement housing using funds authorized for the displacing project when comparable replacement housing is not available.  Funds in excess of those provided under other provisions of the statute may be made available for this purpose on a case-by-case basis.  42 U.S.C. § 4626(a).

222.   Pursuant to 42 U.S.C. § 4625(c)(3), relocation assistance advisory programs shall ensure that a person must have a reasonable opportunity to relocate to a comparable replacement dwelling before being displaced, except in the case of an emergency which requires the person to move immediately to avoid a substantial danger to that person's health or safety.  A "comparable replacement dwelling" under the URA "means any dwelling that is (A) decent, safe, and sanitary; (B) adequate in size to accommodate the occupants; (C) within the financial means of

the displaced person; (D) functionally equivalent; (E) in an area not subject to unreasonable adverse environmental conditions; and (F) in a location generally not less desirable than the location of the displaced person's dwelling with respect to public utilities, facilities, services, and the displaced person's place of employment."  42 U.S.C. § 4601(10).

223.    Under the URA, displaced persons are entitled to their actual, reasonable moving expenses.  42 U.S.C. § 4622.  In addition, displaced persons are entitled to payments to enable them to lease or rent a comparable dwelling for a period not to exceed 42 months.  42 U.S.C. § 4624(a).

224.    Even where a person is displaced because of an emergency, as defined by the Act, any temporary dwelling must be decent, safe and sanitary.  In such a circumstance, the individual remains entitled to relocation assistance following the move to temporary housing and the displacing agency must make available at least one comparable replacement dwelling.  49 C.F.R. § 24.204(c)(3).

225.    Plaintiffs are displaced persons within the definition of the URA.  Each Plaintiff is being forced to move from his or her Palco Marsh residence "as a direct result of a written notice of intent to acquire or the acquisition of such real property in whole or in part for a program or project undertaken by a Federal agency or with Federal financial assistance."  42 U.S.C. § 4601(6)(A).

226.    Plaintiffs have not been able to relocate to a comparable replacement dwelling despite their efforts to find comparable, safe, sanitary and decent replacement housing in advance of the City's May 2 Palco Marsh eviction date.

227.    Defendants have failed to adequately assess Plaintiff's needs and preferences in connection with their relocation, and have failed to make or offer any relocation assistance payments to Plaintiffs in accordance with the requirements of the URA.

228.    Defendants have failed to provide Plaintiffs with a reasonable opportunity to find comparable, safe, decent, and sanitary replacement housing.

229.    Defendants' plan to vacate the Palco Marsh encampment on May 2 and displace Plaintiffs and the other residents of the Palco Marsh encampment violates the requirement of 42

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

STACY COBINE *et al.* v. CITY OF EUREKA *et al.*

U.S.C. § 4626(b) that no person shall be required to move from his residence unless the head of the displacing agency is satisfied that comparable replacement housing is available to that person.

230.    Defendants' violations of the URA have and continue to cause irreparable harm to Plaintiffs and the other residents of the Palco Marsh who will be displaced on May 2.

231.    Defendants' conduct is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law.  It is therefore also actionable pursuant to the Administrative Procedures Act.  5 U.S.C. § 706.

### THIRD CLAIM FOR RELIEF

### Violation of Substantive Due Process

### (Fourteenth Amendment; 42 U.S.C. § 1983; Art. I, § 7, California Constitution)

232.    Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

233.    Defendants' plan to evict Plaintiffs from their homes at the Palco Marsh and seize or destroy Plaintiffs' dwellings and possessions, without providing adequate suitable alternative shelter, affirmatively threatens their liberty interest in bodily security protected by the due process clause of the Fourteenth Amendment to the United States Constitution.  Defendants' planned eviction of Plaintiffs and all other homeless residents of the Palco Marsh threatens to expose them to the dangerous condition of living on the streets without shelter and does so with deliberate indifference to that danger.

234.    Defendants owe Plaintiffs a duty under the due process clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the California Constitution to not place them in a situation of known danger with deliberate indifference to their safety.

235.    The residents of the Palco Marsh, including Plaintiffs, face grave risks to their mental and physical health and safety, and even to their very survival, as a result of their eviction from their homes.  Plaintiffs' right to life and liberty is substantially threatened by the City's planned enforcement of Eureka Municipal Code Section 93.02 at the Palco Marsh encampment.

236.    Plaintiffs seek redress for Defendants' violation of their right to substantive due

process.

## FOURTH CLAIM FOR RELIEF

### Violation of Right to Be Secure from Unreasonable Seizures

### (Fourth Amendment; 42 U.S.C. § 1983)

237.    Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

238.    In or around March 22, 2016, the City of Eureka delivered "Notices to Vacate" to homeless residents of the Palco Marsh stating that all property and structures found at the Marsh encampment as of May 2, 2016 will be subject to seizure and/or destruction.  The City's Notice to Vacate provides that personal property seized during their sweep of the Palco Marsh on May 2 will be summarily and immediately disposed of it the EPD, in its sole discretion, determines that it is abandoned or poses a health or safety hazard.  All other items remaining at the Marsh on May 2 will be confiscated by the City of Eureka and stored for retrieval within ninety (90) days. Property not claimed by evicted Palco Marsh residents within that time period will also be disposed of by the City.  Unlicensed, unvaccinated and/or unaltered animals found at the Palco Marsh encampment on May 2 will also be impounded by the City of Eureka, the animals will be taken to a veterinarian for shots and/or alteration, and Palco Marsh residents must pay those veterinary bills within ten (10) days of issuance or their animals will be euthanized by the City.

239.    Plaintiffs have property rights in their possessions and dwellings at the Palco Marsh.  These dwellings are not abandoned, they are not an immediate threat to public health or safety, and they are not contraband or evidence of a crime.  The City's plan to confiscate or destroy their dwellings and dispossess Plaintiffs and other Palco Marsh residents of their homes after more than a decade of allowing and even encouraging Plaintiffs to establish dwellings at the Palco Marsh will result in the unreasonable seizure and destruction of Plaintiffs' personal property in violation of their Fourth Amendment rights.

240.    Plaintiffs seek redress for Defendants' violation of their right to be secure from unreasonable seizures.

## FIFTH CLAIM FOR RELIEF

### Violation of Right to Procedural Due Process of Law

**(Fourteenth Amendment; 42 U.S.C. § 1983; Art. I, § 7, California Constitution)**

241.    Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

242.    Due process requires a minimum notice and an opportunity to be heard if the government intends to deprive a person of his or her property.  Defendants' planned procedures for dealing with personal property encountered during the scheduled May 2 eviction of the Palco Marsh encampment provide for neither a pre-deprivation or post-deprivation hearing for people whose personal property Defendants intend to take.  Defendants' procedures provide no guidance as to the process that will be followed in disposing of people's belongings, and instead allow EPD officers unilateral discretion to deem items "abandoned" or a "risk to health or safety," in which case they will be summarily and immediately discarded.  Because the property of people who are homeless often appears to be valueless to those in charge of its removal, there is a great risk that it will be mistaken for trash and destroyed.  Due process protections, and particularly the right to a hearing are therefore especially important when the property of people who are homeless is going to be taken.  The absence of provision for a hearing in Defendants' eviction plans will result in a violation of Plaintiffs' rights to procedural due process.

243.    Plaintiffs seek redress for Defendants' violation of their right to procedural due process of law.

### SIXTH CLAIM FOR RELIEF

### Violation of Right to Privacy

**(U.S. Bill of Rights; 42 U.S.C. § 1983; Art. I, § 1, California Constitution)**

244.    Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

245.    Plaintiffs, like all other Californians, enjoy the protections of both Article I, Section 1 of the California Constitution and the penumbra of rights created by the First, Third, Fourth, Fifth and Ninth Amendments of the United States Constitution, including the right to privacy.  Privacy is a fundamental right.

246.    The right to privacy protects the right to make intimate personal decisions and conduct personal activity without observation, intrusion, or interference.  For example, choosing who one lives with and excluding others from one's home are exercises of the right to privacy.

247.   With the knowledge of the City, and sometimes at the City's direction, Plaintiffs created homes and private dwellings at the Palco Marsh.  They have lived in these homes for many years and have exercised their rights to privacy in these habitations.

248.   Defendants' planned eviction of Plaintiffs from their homes and the threatened destruction of their shelters will leave Plaintiffs without any shelter or other place where they may exercise their rights to privacy.  All other venues within the City of Eureka within which Plaintiffs may attempt to exercise their privacy rights – rights they have enjoyed in their homes at the Palco Marsh – will be criminally off-limits to them.

249.   Plaintiffs will face criminal sanction if they seek to remain in their homes at the Palco Marsh.  They will be similarly criminally sanctioned if they establish new shelters anywhere else within the Eureka city limits.  A limited amount of emergency shelter space is available in Eureka, but there are insufficient beds for all Palco Marsh residents, and many residents, including Plaintiffs, have disabilities that preclude them from accessing the emergency shelters and medical conditions that would make it dangerous for them to do so.

250.   Palco Marsh residents who are not precluded by medical condition or disability from utilizing emergency shelters will not be able to do so without surrendering the right to privacy they currently enjoy.  In order to take advantage of such emergency shelter, Plaintiffs will have to give up the right to make intimate personal decisions and conduct personal activity without observation, intrusion or interference.  If they refuse to give up this right and wish to sleep within the Eureka city limits, they will have no choice but to violate Eureka Municipal Code Section 93.02 or risk criminal citation and arrest for sleeping on the sidewalk.

251.   Except under very limited and extreme circumstances that are not present here, public entities in California are prohibited from conditioning the receipt of public benefits on the waiver of constitutional rights.  The City of Eureka violates this principal by conditioning the benefit of obtaining shelter and meals on Plaintiffs giving up their constitutionally protected right to privacy. The public accrues no benefit from this impairment of Plaintiffs' right to privacy, and Defendants cannot satisfy the heavy burden of demonstrating the practical necessity for this condition.

252.    Defendants' plan to seize or destroy Plaintiffs' limited shelter against the elements, expel them from their homes at the Palco Marsh encampment, criminally cite or arrest them if they fall asleep in public, and condition the provision of shelter on the waiver of Plaintiffs' right to privacy under the United States and California Constitutions is a violation of Plaintiff's constitutional right to privacy.

253.    Plaintiffs seek redress for Defendants' violation of their constitutional right to privacy.

## PRAYER FOR RELIEF

WHEREFORE, based on the allegations asserted herein, Plaintiffs respectfully request relief as follows:

1.      A temporary restraining order and/or preliminary and permanent injunction enjoining Defendants, their officers, employees, assignees, successors, and agents from enforcing Eureka Municipal Code Section 93.02 against persons who are homeless and currently living at the Palco Marsh encampment so long as there is not a location available in the City of Eureka where they can find shelter that protects their right to privacy;

2.      A temporary restraining order and/or preliminary and permanent injunction enjoining Defendants, their officers, employees, assignees, successors, and agents from enforcing Eureka Municipal Code Section 93.02 against persons who are homeless and currently living at the Palco Marsh encampment without providing them with an adequate hearing before depriving them of their property interest in their personal property and/or dwelling;

3.      A temporary restraining order and/or preliminary and permanent injunction enjoining Defendants, their officers, employees, assignees, successors, and agents from enforcing Eureka Municipal Code Section 93.02 against persons who are homeless and currently living at the Palco Marsh encampment so long as there is insufficient emergency shelter, transitional housing units, and/or permanent affordable and/or subsidized housing units to accommodate the current residents of the Palco Marsh encampment and such persons are forced to violate Code Section 93.02 to engage in life-sustaining activities simply as an incident of their

homeless status;

4.      A temporary restraining order and/or preliminary and permanent injunction enjoining Defendants, their officers, employees, assignees, successors, and agents from seizing the shelters, animals, and personal belongings of persons who are homeless and currently living at the Palco Marsh encampment in violation of the Fourth Amendment to the United States Constitution;

5.      A temporary restraining order and/or preliminary and permanent injunction enjoining Defendants, their officers, employees, assignees, successors, and agents from violating the Fourteenth Amendment substantive due process rights of persons who are homeless and currently living at the Palco Marsh encampment by evicting them from their homes and shelters without providing adequate and suitable alternative shelter or designated camping space.

6.      A temporary restraining order and/or preliminary and permanent injunction enjoining Defendants, their officers, employees, assignees, successors and agents from violating the Fourteenth Amendment procedural due process rights of persons who are homeless and currently living at the Palco Marsh encampment by evicting them and seizing their shelters and property without any pre-deprivation or post-deprivation hearing and without adequate notice required by law;

7.      A temporary restraining order and/or preliminary and permanent injunction enjoining Defendants, their officers, employees, assignees, successors and agents from evicting persons who are homeless and currently living at the Palco Marsh encampment without first paying Plaintiffs relocation assistance monies as required by the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970;

8.      A declaration that Defendants' past, present, and threatened future enforcement of Eureka Municipal Code Section 93.02 against homeless persons living at the Palco Marsh encampment violates Plaintiffs' rights to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution;

9.      A declaration that Defendants' past, present, and threatened future confiscation of the shelters, animals and personal belongings of homeless people living at the Palco Marsh

encampment violates Plaintiffs' rights to be secure from unreasonable seizure under the Fourth Amendment to the United States Constitution;

     10.    A declaration that Defendants' past, present, and threatened future enforcement of Eureka Municipal Code Section 93.02 against homeless people living at the Palco Marsh encampment and eviction of those persons from the Palco Marsh without first paying them relocation assistance monies violates the requirements of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970;

     11.    A declaration that Defendants' past, present, and threatened future confiscation of the shelters, animals and personal belongings of homeless people living at the Palco Marsh encampment and eviction of those persons from the Palco Marsh without pre-deprivation or post-deprivation hearings violates Plaintiffs' rights to procedural and substantive due process under the Fourteenth Amendment to the United States Constitution and under Article I of the California Constitution;

     12.    A declaration that Defendants' past, present, and threatened future enforcement of Eureka Municipal Code Section 93.02 against homeless persons living at the Palco Marsh encampment, under the circumstances presented here, violates Plaintiffs' rights to privacy guaranteed by the United States and California Constitutions;

     13.    Plaintiffs' costs incurred in this lawsuit pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, as well as any appropriate provisions of California law;

     14.    Plaintiffs' reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and analogous provisions of California law; and

     15.    All such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues triable to a jury.

Dated: April 25, 2016                    Respectfully Submitted,

                                        /s/ Shelley K. Mack
                                        _____
                                        Peter E. Martin
                                        Shelley K. Mack
                                        Attorneys for Plaintiffs
                                        STACY COBINE, NANETTE DEAN,
                                        CHRISTINA RUBLE, EDWARD BULLOCK-
                                        WEST, GENEVA BRINSON, PHILIP
                                        MCCOVEY, LLOYD PARKER, GERRIANNE
                                        SCHULZE, SARAH HOOD, AARON KANGAS,
                                        LYNETTE VERA, AUBREY SHORT, MARIE
                                        ANNTONETTE KINDER, and JOHN TRAVIS