IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STACY COBINE, NANETTE DEAN, CHRISTINA RUBLE, LLOYD PARKER, GERRIANNE SCHULZE, SARAH HOOD, AARON KANGAS, LYNETTE VERA, AUBREY SHORT, MARIE ANNTONETTE KINDER, and JOHN TRAVIS,

Plaintiffs,

v.

CITY OF EUREKA, EUREKA POLICE DEPARTMENT, and ANDREW MILLS, in his official capacity as Chief of Police,

Defendants.

No. C 16-02239 JSW

**ORDER GRANTING IN PART AND DENYING IN PART TEMPORARY RESTRAINING ORDER**

Now before the Court is the motion for temporary restraining order ("TRO") and order to show cause why a preliminary injunction should not be issued to enjoin the City of Eureka, the Eureka Police Department and Andrew Mills, Chief of Police ("collectively "Eureka") from removing eleven homeless individuals and their belongings from their encampment at the Palco Marsh on the Eureka Waterfront on May 2, 2016. The request for injunctive relief ("Motion") was filed by plaintiffs Stacy Cobine, Nanette Dean, Christina Ruble, Lloyd Parker, Gerrianne Schulze, Sarah Hood, Aaron Kangas, Lynette Vera, Aubrey Short, Marie Anntonette Kinder, and John Travis (collectively "Plaintiffs").

The Court has considered the parties' papers, relevant legal authority, and the record in this case, and having had the benefit of oral arguments on Friday, April 29, 2016, and for the reasons that follow, the Court hereby GRANTS IN PART and DENIES IN PART the TRO.

**BACKGROUND**

Plaintiffs, a group of homeless individuals, sue Eureka for alleged violations of their constitutional and statutory rights. According to the allegations in their complaint, Plaintiffs contend that Eureka has announced that on May 2, 2016, it will evict approximately 150 homeless people who are currently living at a homeless encampment at the Palco Marsh, including the eleven plaintiffs. (Complaint ("Compl.") ¶ 1.)[1] The Palco Marsh is located on City property near the Bayshore Mall in Eureka, California, and is a portion of land occupied by a homeless population since 2002. (*Id.*)

On March 18, 2016, the City of Eureka established a deadline of May 2, 2016 for the removal of the homeless encampment currently in violation of Eureka's anti-camping ordinance, codified at Eureka Municipal Code section 93.02. (*Id.* ¶ 3.) City staff had recommended the adoption of the Open Space Property Maintenance Plan by the City Council: "Staff recognizes that the implementation of rapid housing is longer term solution to ending homelessness and that allowing unfettered illegal camping along the waterfront is detrimental to the community's safety, leads to continued environmental degradation, and negatively impacts our tourism economy." (Day-Wilson Decl. ¶ 12.) On March 22, 2016, the Eureka Police Department distributed flyers entitled "Notice to Vacate" to homeless individuals living at the Palco Marsh. (*Id.*; *see also* Request for Judicial Notice ("RJN"), Ex. B.)[2] The Notice indicates that it is a violation of the Municipal Code to camp on public or private property within the City of Eureka and that all personal property must be removed prior to May 2, 2016 or the City will remove the property. (*Id.*) Should Eureka deem any property a health and safety hazard, it shall be removed immediately and discarded and any property

---

[1] In its opposition to the motion, Eureka represents that the current population at Palco Marsh is 113 persons. (Opp. Br. at 3, Declaration of Cyndy Day-Wilson ("Day-Wilson Decl.") ¶ 22; Declaration of Andrew Mills ("Mills Decl.") ¶ 24.)

[2] Plaintiffs request that the Court take judicial notice of a number of public documents, including the Notice to Vacate. The Court finds that materials it relies upon herein provided are subject to judicial notice and the request is GRANTED. *See* Fed. R. Evid. 201(b).

2

deemed to be abandoned will be immediately discarded. (*Id.*) The Notice further indicates that any property that is removed may be reclaimed by arrangement with the City within 90 days of its removal. (*Id.*) Lastly, the Notice indicates that any person who fails to comply with the provisions of the Notice and to vacate the area of all possessions will be prosecuted. (*Id.*) Plaintiffs received the Notice. (*See* Declaration of Stacy Cobine ¶ 9; Declaration of Nanette Dean ¶ 11; Declaration of Sarah Hood ¶ 10; Declaration of Marie Anntonette Kinder ¶ 10; Declaration of Aubrey Short ¶ 8; Declaration of Lynette Vera ¶ 9; Declaration of John Travis ¶ 11; Mills Decl. ¶ 21.) In addition, the Police Department intends to follow its procedures regarding the collection and storage of evidence provide for the collection, retention and release of property. (*See* Mills Decl., Ex. D.)

The City of Eureka's anti-camping ordinance provides:

**§ 93.02   Camping Permitted Only in Specifically Designated Areas**

(A)   Except as provided herein, no person shall camp in any public of private space or public or private street, except in areas specifically designed for such use. ***CAMP*** shall mean residing in or using a public or private space for living accommodation purposes, such as sleeping activities, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), or storing personal belongings (including but not limited to clothing, sleeping bags, bedrolls, blankets, sheets, luggage, backpacks, kitchen utensils, cookware, and similar material), or making any fire or using any tents, regularly cooking meals, or living in a parked vehicle. These activities constitute camping when it reasonably appears, in light of all the circumstances, that a person is using a public space as a living accommodation regardless of his/her intent or the nature of any other activities in which he/she might also be engaging. ***PRIVATE*** shall mean affecting or belonging to private individuals, as distinct from the public generally. All police officers are hereby charged with the enforcement of the camping provisions of this chapter.

Eureka, Cal. Municipal Code § 93.02. Public space includes parks, beaches, public parking lots or public areas. Public streets are defined to include any public street or public sidewalk, including public benches. (*Id.*)

Penalties for violation of the anti-camping code are provided by Eureka Municipal Code section 10.99, which provides that "[i]t shall be unlawful for any person to violate any provision or fail to comply with any of the requirements of this code. . . . Any person violating any of such provisions or failing to comply with any of the mandatory requirements of this code shall be guilty of a misdemeanor . . . [and] shall be punishable by a fine of not more than $1,000 or by

3

1 imprisonment in the county jail for a period not exceeding six months, or by both such fine and
2 imprisonment." Eureka, Cal. Municipal Code § 10.99.

3       The City of Eureka plans to evict the homeless occupants of the Palco Marsh in order to tear
4 down several concrete structures located in the vicinity and to make way for a new segment of the
5 Eureka Waterfront Trail. In order to accommodate the current occupants of the homeless
6 encampment, Eureka has directed the homeless individuals to contact existing emergency shelters
7 and other alternative housing resources in the City. In addition, the City has authorized two
8 temporary measures to assuage the impact of the removal from Palco Marsh, including opening a
9 city-owned parking lot for approximately 50-60 homeless individuals to sleep in during nighttime
10 hours until June 10 and approving a private plan to house 40 homeless individuals for six months in
11 converted metal shipping containers. (*See* Declaration of Paul Boden ("Boden Decl.") ¶ 7; Court
12 Exh. 2.) Eureka represents that there are sufficient shelters and temporary housing options to house
13 the members of the Palco Marsh community. (*See* Day-Wilson Decl. ¶ 22.) Plaintiffs contend,
14 however, that the number of unsheltered homeless individuals outnumber the number of available
15 shelter beds and other temporary housing units in the area roughly by a factor of two or three to one.
16 (Motion at 2; Boden Decl. ¶¶ 7, 11, 12; Declaration of Dr. Barry Zevin ¶ 18.)[3]

17       Plaintiffs contend that the homeless population in the City of Eureka has far outstripped the
18 City's available shelter and housing resources for some time. In the face of this crisis, the Police
19 Department has treated the Palco Marsh as an option for the homeless. For the last decade, Plaintiffs
20 contend, the City has known of and allowed the homeless to live in the Marsh and effectively
21 encouraged people to move there. Because the City has threatened criminal prosecution in order to
22 enforce the notice to vacate and enforce the anti-camping ordinance, Plaintiffs contend that Eureka
23 is effectively criminalizing homelessness. Plaintiffs argue that because of the inadequate supply of
24 emergency or transitional or affordable housing, "there will be nowhere for a homeless person to
25 sleep in Eureka without risking citation, arrest and prosecution." (Motion at 3.)

---

28     [3] Plaintiffs cite an article from the North Coast Journal. (Declaration of Shelley K. Mack, Ex. 5 at 2.) This is not admissible evidence for the truth of the statements contained therein.

4

Although the Court is sympathetic to the plight of all the homeless population in Eureka, the Court only has discretion to address the concerns of the eleven individual plaintiffs currently represented before it. At the oral arguments on the Motion, counsel for Eureka represented that the City intends to put in place mechanisms to address the process by which the property of the homeless population will be stored, tagged, and protected from theft by lodging the property in locked containers at a nearby site which will remain accessible to its owners. Further, defense counsel represented that all of the 113 remaining residents on the Palco Marsh will retain adequate alternative housing options, but specifically assured this Court that at a minimum the City stands ready to provide and transport the eleven individuals present before the Court with adequate shelter on May 2, 2016. The effect of the representations persuaded this Court that Plaintiffs' needs will be properly attended and incorporates those representations within the context of this Order. To the extent the City performs as it represents, the eleven plaintiffs shall have the remedy they seek – adequate shelter and due process.

**ANALYSIS**

**A.     Applicable Legal Standard for Temporary Restraining Order.**

In order to obtain a temporary restraining order or a preliminary injunction, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008) (citations omitted). The *Winter* court also noted that because injunctive relief is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)). Thus, "[i]n each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id*. at 24 (quoting *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

Following *Winter*, courts in the Ninth Circuit may apply a sliding scale test when there is a

1  lesser showing of likelihood of success that amounts to "serious questions on the merits" and the
2  balance of hardships tips strongly in the plaintiff's favor, as long as the plaintiff satisfies the other
3  two prongs under *Winter* by showing that there is a likelihood of irreparable injury and that the
4  injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134
5  (9th Cir. 2011). Preliminary injunctive relief is appropriate where "a plaintiff demonstrates . . . that
6  serious questions going to the merits were raised and the balance of hardships tips sharply in the
7  plaintiff's favor." *Id.* (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en
8  banc)). The plaintiff must also satisfy the irreparable harm and public interest requirements under
9  *Winter*. *Id.* at 1132, 1135. The party seeking the injunction bears the burden of proving the requisite
10 elements. *See Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009). Once these
11 prerequisites are met, granting temporary injunctive relief allows district courts to preserve the status
12 quo where difficult legal questions require more deliberate investigation.

### B.     Fourth and Fourteenth Amendment Rights.

Plaintiffs contend that, by seizing their property on May 2, 2016 should they not abandon the encampment, Eureka's intended conduct will violate Plaintiffs' Fourth and Fourteenth Amendment rights to be secure from government seizure and destruction of their personal property without due process. The Fourth Amendment protects Plaintiffs and other homeless individuals' retreats, regardless how ramshackle. "A man can still control a small part of his environment, his house; he can retreat thence from outsiders, secure in the knowledge that they cannot get at him without disobeying the Constitution. That is still a sizable chunk of liberty – worth protecting from encroachment. A sane, decent, civilized society must provide some such oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle." *Silverman v. United States*, 365 U.S. 505, 511 n.4 (1961).

Although "our sane, decent, civilized society has failed to afford more of an oasis, shelter, or castle for the homeless . . . than their [tents], it is in keeping with the Fourth Amendment's 'very core' for the same society to recognize as reasonable homeless persons' expectation that their [tents] are not beyond the reach of the Fourth Amendment." *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1028 n.6 (9th Cir. 2012) (citing *State v. Mooney*, 588 A.2d 145, 161 (Conn. 1991) ("The interior of

[the homeless defendant's duffel bag and cardboard box] represented, in effect, the defendant's last shred of privacy from the prying eyes of outsiders, including the police. Our notions of custom and civility, and our code of values, would include some measure of respect for that shred of privacy, and would recognize its assertion as reasonable under the circumstances of this case.").) "The government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking." *Id.* at 1032 (citing *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir. 2008).) "This simple rule holds regardless of whether the property in question is an Escalade or [a tent], a Cadillac or a cart." *Id.*

The Court finds that the homeless Plaintiffs' property is entitled to Fourth Amendment protection. In that context, the specific question before this Court is whether the Notice to Vacate and the planned conduct of the Eureka defendants in carrying out the City's efforts to enforce its anti-camping ordinance amount to a violation of that Fourth Amendment protection. Litigants in similar cases have succeeded in challenging a city ordinance where "they showed that the city failed to provide sufficient notice to the plaintiffs before seizing the property." *Acosta v. City of Salinas*, 2012 WL 1446781, at *5 (N.D. Cal. April 13, 2016); *see also Lavan*, 693 F.3d at 1032 (finding a substantial likelihood of success on the merits of a Fourth and Fourteenth Amendment claim where city admitted that it had a policy and practice of seizing and destroying homeless individuals' unabandoned possessions without any notice or an opportunity to be heard either before or after the seizure of their property). Here, however, the ordinance includes several safeguards to prevent the erroneous or unconstitutional deprivation of Plaintiffs' property. Plaintiffs received notice of the plan to remove them and their property from the public property on March 22, 2016, well in advance of the May 2, 2016 eviction date. The notice provides that any property that is removed may be reclaimed by calling to schedule a date and time for pick up within 90 days of removal. (RJN, Ex. B.) In addition, the Police Department's procedures provide for the collection, retention and release of property. (Mills Decl., Ex. D.) The City's Notice to Vacate further indicates that it only intends to dispose of items that pose a risk to public health or safety "as was permitted by the injunction in *Lavan*." *Martin v. City and County of Honolulu*, 2015 WL 5826822, at *7 (D. Hawaii Oct. 1, 2015) (citing *Lavan*, 693 F.3d at 1026). The Court concludes, based on the representations made at oral

7

1 argument and the record in this case, that the City has provided sufficient due process through
2 advance notice and will provide adequate post-seizure remedies.
3 With these provisions in place, the Court finds that Plaintiffs have not met their burden to
4 demonstrate that there is cause for injunctive relief pursuant to the Fourth and Fourteenth
5 Amendment claims for the treatment of their property.

**C.    Eighth Amendment Rights.**

Plaintiffs argue that criminalizing public camping in a city without adequate shelter space to accommodate the city's homeless population constitutes the criminalization of homelessness itself, in violation of the Eighth Amendment.

The Eighth Amendment prohibition against cruel and unusual punishment "imposes substantive limits on what can be made criminal and punished as such." *Ingraham v. Wright*, 430 U.S. 651, 667-68 (1977). The Supreme Court has interpreted the scope of those limitations to find that laws criminalizing an individual's status, rather than specific conduct, are unconstitutional. *See, e.g., Robinson v. California*, 370 U.S. 660, 666-67 (1962). In *Robinson*, the Court struck down a state statute that made it a criminal offense to be addicted to narcotics on the ground that it made an addicted person "continuously guilty of [the] offense, whether or not he has ever used or possessed any narcotics within the State, and whether or not he has been guilty of any antisocial behavior there." *Id.* at 666. Such a statute, the *Robinson* Court declared, would be akin to a law making "it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease," and would "be universally thought to be an infliction of cruel and unusual punishment." *Id.*

A few years later, in *Powell v. Texas*, the Supreme Court addressed whether a statute criminalizing public intoxication would be impermissible under the Eighth Amendment. 392 U.S. 514 (1968). In a four-judge plurality upholding the conviction, the Court found that its prior precedent in *Robinson* prohibited the criminalization of status and noted that the statute in *Powell* concerned conduct – the act of being intoxicated in public, rather than the status of alcohol addiction. *Id.* at 534. The plurality found that plaintiff had not definitively demonstrated that he was incapable of avoiding public intoxication as a result of his alcohol addiction. *Id.* at 521-25. In a separate concurrence, Justice White upheld the plaintiff's conviction and focused not on the

1 distinction between status and conduct, but rather on the voluntariness of the prohibited conduct.
2 *See Powell*, 392 U.S. at 548-51 (White, J., concurring). Under Justice White's analysis, the statute
3 would impermissibly criminalize conduct under the Eighth Amendment if sufficient evidence were
4 presented to demonstrate the prohibited conduct was involuntary based on one's condition. *Id.* at
5 551. In his concurrence, Justice White noted that for the homeless, "[f]or all practical purposes the
6 public streets may be home for these unfortunates, not because their disease compels them to be
7 there, but because, drunk or sober, they have no place else to go and no place else to be when they
8 are drinking." *Id.* Although he ultimately found that the plaintiff had not presented evidence
9 demonstrating that he was incapable of avoiding public places while intoxicated, Justice White
10 found that alcoholics who are homeless *could* show that "resisting drunkenness is impossible and
11 that avoiding public spaces when intoxicated is also impossible," and for those individuals, the
12 statute "is in effect a law which bans a single act for which they may not be convicted under the
13 Eighth Amendment – the act of getting drunk." *Id.*

14 The Ninth Circuit in *Jones v. City of Los Angeles* held a Los Angeles ordinance that
15 criminalized sitting, lying, or sleeping in a public way at any time of day was unconstitutional as
16 applied to the homeless. 444 F.3d 1118, 1138 (9th Cir. 2006), *vacated by settlement*, 505 F.3d 1006
17 (9th Cir. 2007).[4] Because the record in *Jones* affirmatively established that the number of homeless
18 individuals vastly outnumbered the amount of shelter beds and low income housing available in Los
19 Angeles, the court determined that the homeless had no choice but to be present on the
20 neighborhood's public streets and sidewalks. *Id.* at 1137. Accordingly, the court found that the
21 Eighth Amendment prohibited punishing involuntary sitting, lying, or sleeping in public at any time
22 of day because such conduct is an unavoidable consequence of being human and homeless without
23 any available shelter in the City of Los Angeles. *Id.* at 1138.

24 Under the rubric adopted in *Jones*, the determination whether the ordinance in this matter
25 violates the Eighth Amendment requires a two-part inquiry. First, the Court must determine
26 whether the homeless have no choice but to sleep in the City's public spaces. "This could be

---

[4] Although the opinion has been vacated and cannot be cited for precedential value, the Court finds its reasoning is persuasive here.

9

1 established either on the basis that there is insufficient shelter space or perhaps because, for at least
2 a portion of the homeless population, the 'chronic homeless,' living in a shelter is not a viable
3 option." *Bell v. City of Boise*, 834 F. Supp. 2d 1103, 1108 (D. Idaho 2011), *reversed on other*
4 *grounds*, 709 F.3d 890, 894-95 (9th Cir. 2013).[5] Second, the Court must find that the enforcement
5 of the ordinance "effectively penalizes the homeless simply for being present or engaging in
6 innocent activity, such as sleeping, that does not warrant punishment under the Eighth Amendment
7 and, in effect, criminalizes the status of being homeless." *Id.*

8 Plaintiffs contend that the number of unsheltered homeless individuals in the City of Eureka
9 outnumber the number of available shelter beds and other temporary housing units in the area
10 roughly by a factor of three or two to one. (*See, e.g.,* Boden Decl. ¶¶ 7, 11, 12; Declaration of Dr.
11 Barry Zevin ¶ 18.) Plaintiffs also contend that there are restrictions on certain shelters that some
12 homeless individuals are unable to meet, thereby preventing them from obtaining shelter space even
13 when the beds may remain unoccupied. The Court notes that the 2015 Point-in-Time Count found
14 that of the 1,319 homeless individuals surveyed, 844 of them, or 64.3% were unsheltered, but it is
15 not clear if that was by choice or by necessity. (RJN, Ex. L.) However, the City represents that
16 there are sufficient shelters and temporary housing options to house the current members of the
17 Palco Marsh community. (*See* Day-Wilson Decl. ¶ 22.)

18 At oral arguments on the Motion, Eureka represented that it could and that it would in fact
19 provide shelter for the entire remaining homeless population currently residing in Palco Marsh.
20 Important to the resolution of this Motion, Eureka further specifically represented that it guaranteed
21 shelter for the eleven plaintiffs before this Court. Based on those representations, the Court finds
22 that should the City provide adequate transport and shelter to the eleven plaintiffs before this Court,
23 the clearing of the encampment may go forward in its totality. Should the City not deliver on its
24 promises, however, the Court shall enjoin the clearing of only the settlements in the encampment of
25 the eleven individuals currently represented in this case.

---

28 [5] The Ninth Circuit reversed the district court opinion as moot because enforcement of the statute had been specifically prohibited by special order of the Boise Police Department where a person was on public property when there was no available overnight shelter. 834 F. Supp. 2d at 1108.

10

**D.  Injunctive Relief.**

   **1.   Serious Questions Going to the Merits.**

The Court has found that Plaintiffs met their burden to demonstrate that there are serious questions regarding the merits of their Eighth Amendment claim, but not their Fourth and Fourteenth Amendment claims.[6] Accordingly, this factor weighs heavily in favor of an injunction of the displacement of the eleven individuals.

   **2.   Balance of Hardships.**

A court must identify the possible harm caused by issuing the temporary injunction against the possibility of harm caused by not issuing it in order to determine which way the balance of the equities tips. *See University of Hawaii Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108-09 (9th Cir. 1999). Although the Court finds that there are several safeguards to prevent the unlawful deprivation of Plaintiffs' personal property without a temporary restraining order, without the City delivering on their promises, Plaintiffs will not have a place to live and their mere existence within the City limits would subject them to criminal prosecution.

In light of these considerations, the balance of hardships weigh heavily in favor of injunctive relief in the absence of a secure alternative shelter for the eleven plaintiffs in this matter.

   **3.   Irreparable Harm.**

The Court finds that by raising serious questions regarding anticipated Eighth Amendment violations, the Plaintiffs have demonstrated that without an injunction or placement in an adequate shelter by the City as represented, the eleven Plaintiffs would suffer irreparable harm. *See Nelson v. Nat'l. Aeronautics and Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."). Although the City articulates harm to the environment, to their plans to fulfill a promise to convert the area to a nature trail, and to their insurance obligations which requires the City to clear the surrounding area of the concrete structures, the Court finds in

---

[6] The Court does not find that Plaintiffs have met their burden to raise serious questions with regard to the their second claim for relief for violation of the Uniform Relocation Assistance Act. 42 U.S.C. §§ 4601 *et seq.* On this record, the Court is not persuaded that Plaintiffs qualify as displaced persons under the statute.

11

the balance of harms, Plaintiffs' constitutional injury is irreparable, while the City's potential harms are monetary.

### 4. Public Interest.

The Court recognizes the public interest of protecting the public health and safety as well as preserving the environment and affording the City the benefits of a nature trail. The Court also, however, recognizes the public interest in maintaining the protections afforded by the Constitution to those most in need of such protection. The Court finds the public interest weighs in favor of Plaintiffs.

### E. Issuance of the Injunction and Bond Requirement.

Applying the "serious questions" sliding scale approach recognized in *Alliance for The Wild Rockies*, 632 F.3d at 1135, this Court determines that issuance of a temporary restraining order to enjoin eviction next week is proper based on the serious questions raised by Plaintiffs' constitutional claims, the balance of hardships tipping heavily in favor of Plaintiffs, the strong possibility of irreparable injury and the interest of the public. However, enjoining the displacement of the eleven plaintiffs is appropriate here, but only should the City not deliver as promised adequate transport and shelter to the Plaintiffs. The fate of the remaining non-named homeless population at Palco Marsh is beyond the reach of this Order or the Court's jurisdiction.

Under Rule 65, "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Plaintiffs have no resources. The Court does not require Plaintiff to post a bond at this time.

### F. Conditions of Injunction.

As represented by the City of Eureka, the Court HEREBY RETRAINS and ENJOINS Defendants, their agents, servants, employees, attorneys, and all other acting in concert with or at their direction from enforcing Eureka Municipal Code section 93.02 and the March 18, 2016 Notice to Vacate against Plaintiffs on May 2, 2016, unless and until all of the following conditions are first

///

met:

    a.    Defendants must provide emergency shelter, not at the City-owned parking lot located at the corner of Washington and Koster Streets for all eleven Plaintiffs beginning on Monday, May 2, 2016. Such provision is not indefinite and Plaintiffs' stay at any emergency shelter within the City of Eureka shall be subject to the rules and limitations of such shelter.

    b.    Defendants must abide by the following procedures with respect to Plaintiffs' personal property and belongings:

        i.    96-gallon tote(s) shall be provided for each individual Plaintiff to use for the purpose of storing their personal belongings, with said totes to be provided in sufficient numbers for Plaintiffs to store all of their personal belongings;

        ii.    Each tote container, once packed, closed, and labeled, shall be locked with a padlock or lock or similar quality provided by Defendants, unless Plaintiffs wish to provide their own locks for securing their individual tote containers;

        iii.    Defendants shall provide identification tags to Plaintiffs for each 96-gallon tote and each larger item stored outside of a tote to allow Plaintiffs to label their belongings for later retrieval from storage;

        iv.    In the event that certain items belonging to Plaintiffs can be placed inside a 96-gallon tote, but are too large to permit the tote to be closed and locked, Defendants shall wrap or cover the tote and any protruding items with plastic or similar material before labeling and storage;

        v.    Defendants shall permits Plaintiffs to maintain custody of all items they require for their daily lives (e.g., clothing, toiletries, books, items of sentimental importance, etc.) and wish to bring with them to their emergency shelter accommodations, as well as their pets and/or

13

       service animals (to be housed on-site at the temporary shelter at which Plaintiffs will be accommodated in accordance with shelter rules) and shall not confiscate, impound, store and/or destroy such items;

  vi.   Defendants shall refrain from discarding or destroying any items belonging to Plaintiffs for any reason, unless Plaintiffs fail to claim and retrieve such items after they have been stored by Defendants for 90 days;

  vii.   Defendants shall transport all of Plaintiffs' personal belongings (including but not limited to all items stored in 96-gallon tote containers and all larger items unable to fit in 96-gallon tote containers) to the location where they are to be stored; and

  viii.   Defendants shall store Plaintiffs' personal belongings, packed and labeled in accordance with the provisions of this Paragraph, in one or more locked Conex storage containers to be located in the North 40 parking lot at the Bayshore Mall or at the City of Eureka Corp Yard. The Conex storage containers in which Plaintiffs' personal belongings are stored shall be used only to store items belonging to Plaintiffs, and not any other persons residing at the Palco March on May 2, 2016.

  ix.   Plaintiffs' personal belongings shall be stored by defendants for a period of no less than 90 days, at Defendants' expense, unless Plaintiffs request to claim and retrieve those items sooner. At the expiration of this 90-day period, subject to any further orders of this Court, Defendants may dispose of any items that remain unclaimed by Plaintiffs.

**CONCLUSION**

For the reasons set forth above, Plaintiffs' motion for TRO to enjoin is GRANTED IN PART and DENIED IN PART.

**IT IS SO ORDERED.**

Dated: May 2, 2016

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE